# UNITED STATES *v.* CALIFORNIA.

No. 5, Original.  Argued December 7–8, 1964.—
Decided May 17, 1965.

*Solicitor General Cox* argued the cause for the United States. With him on the briefs were *Stephen J. Pollak, George S. Swarth* and *Martin Green.*

*Richard H. Keatinge,* Special Assistant Attorney General of California, argued the cause for defendant. With him on the briefs were *Thomas C. Lynch,* Attorney General, *Stanley Mosk,* former Attorney General, *Charles E. Corker, Howard S. Goldin* and *Jay L. Shavelson,* Assistant Attorneys General, and *Warren J. Abbott* and *N. Gregory Taylor,* Deputy Attorneys General.

*George N. Hayes,* Special Assistant Attorney General of Alaska, by special leave of Court, argued the cause for the State of Alaska, as *amicus curiae.* With him on the brief were *Warren C. Colver,* Attorney General, and *Avrum M. Gross,* Special Assistant Attorney General.

*John B. Ogden* filed briefs for Carl Whitson, as *amicus curiae.*

142

Mr. Justice Harlan delivered the opinion of the Court.

The present case requires us to determine the extent of submerged lands granted to the State of California by the Submerged Lands Act of 1953,[1] and in particular to declare whether specified bodies of water on the California coast are "inland waters" within the meaning of that Act. A substantial amount of background is necessary to place the issues in perspective.

## I.

### The Setting of the Case.

This is a suit begun in 1945, brought by the United States against California to determine dominion over the submerged lands and mineral rights under the three-mile belt of sea off the coast of California. In 1947 the Court decreed:

> "The United States of America is now, and has been at all times pertinent hereto, possessed of paramount rights in, and full dominion and power over, the lands, minerals and other things underlying the Pacific Ocean lying seaward of the ordinary low-water mark on the coast of California, and outside of the inland waters, extending seaward three nautical miles . . . . The State of California has no title thereto or property interest therein." *United States v. California,* 332 U. S. 804, 805, *Order and Decree.*

After the entry of this decree, the United States asked that the lands awarded to it be defined in greater detail in certain areas where there was substantial oil well activity, and which California asserted lay within inland waters. The Court appointed a Special Master,[2] and directed him to consider seven specified segments of the

[1] 67 Stat. 29, 43 U. S. C. §§ 1301–1315 (1958 ed.).
[2] The late William H. Davis of New York City.

California coast [3] to determine the line of ordinary low water and the outer limit of inland waters. These segments included various bays, and, as the problem evolved, the so-called "overall unit area" consisting of the waters inside a line encompassing the islands off the shore of southern California, some as far as 50 miles out.[4] The Special Master's Report, generally favoring the position of the United States, was filed with this Court in November 1952, 344 U. S. 872. He adopted as his criteria for defining inland waters those applied by the United States

---

[3] The segments were as follows:

1. From Point Conception to Point Hueneme;
2. San Pedro Bay;
3. From the southern extremity of San Pedro Bay to the western headland at Newport Bay;
4. Crescent City Bay;
5. Monterey Bay;
6. San Luis Obispo Bay;
7. Santa Monica Bay.

We directed the Special Master to recommend answers to the following questions:

"*Question 1.*—What is the status (inland waters or open sea) of particular channels and other water areas between the mainland and offshore islands, and, if inland waters, then by what criteria are the inland water limits of any such channel or other water area to be determined?

"*Question 2.*—Are particular segments in fact bays or harbors constituting inland waters and from what landmarks are the lines marking the seaward limits of bays, harbors, rivers, and other inland waters to be drawn?

"*Question 3.*—By what criteria is the ordinary low water mark on the coast of California to be ascertained?" 342 U. S. 891.

[4] California's claim to the "overall unit area" runs from Point Conception to Richardson Rock (21 miles across water), to San Miguel Island, to Santa Rosa Island, to Gull Island; thence to Begg Rock (35.8 miles), to San Nicolas Island, to San Clemente Island (43 miles); thence back to the mainland at Point Loma (56.8 miles). San Nicolas and San Clemente Islands are over 50 miles from shore. See Map attached as Appendix C to the dissenting opinion, *post,* at 178.

in the conduct of its foreign affairs as of the date of the *California* decree, October 27, 1947—in particular, a rule that only a bay having a closing line across its mouth no more than 10 miles in length and enclosing a sufficient water area to satisfy the so-called Boggs formula [5] would be inland water, with the qualification that a bay which had been historically considered inland water would so continue.[6]    Both parties noted their exceptions to the

---

[5] To determine whether a coastal indentation is of sufficient depth and shape to be inland water, the Boggs formula would (1) draw the closing line across the mouth of the indentation; (2) draw a belt around the shore of the indentation (similar to a small marginal belt) having a width equal to one-fourth the length of the closing line across the entrance; (3) compare the remaining area inside the closing line with the area of a semicircle having a diameter equal to one-half of the length of the closing line, and if the enclosed area is larger than that of the semicircle, the indentation is inland water. Boggs, Delimitation of the Territorial Sea, 24 Am. J. Int'l L. 541, 548.

[6] The Special Master recommended as follows:

"*Question 1:* The channels and other water areas between the mainland and the offshore islands within the area referred to by California as the 'over-all unit area' are not inland waters. They lie seaward of the baseline of the marginal belt of territorial waters, which should be measured in each instance along the shore of the adjoining mainland or island, each island having its own marginal belt.

"*Question 2:* No one of the seven particular coastal segments now under consideration for precise determination and adjudication is a bay constituting inland waters. The landmarks from which the lines marking the seaward limits (the straight-line segments of the baseline of the marginal belt) of bays, harbors, rivers and other inland waters are to be drawn, are as follows:

"*Bays*

"The extreme seaward limit of inland waters of a bay is a line ten nautical miles long. For indentations having pronounced headlands not more than ten nautical miles apart, and having a depth as hereinafter defined, a straight line is to be drawn across the entrance. Where the headlands are more than ten nautical miles apart, the straight line is to be drawn across the indentation at the point nearest the entrance at which the width does not exceed ten nautical miles. In either case the requisite depth is to be determined by the following criterion: The envelope of all arcs of circles having a radius equal

Report, but before any further action was taken, Congress enacted the Submerged Lands Act.

The Submerged Lands Act [7] grants to the States "title to and ownership of the lands beneath navigable waters

to one-fourth the length of the straight line shall be drawn from all points around the shore of the indentation; if the area enclosed by the straight line across the entrance and the envelope of the arcs of the circles is greater than that of a semicircle with a diameter equal to one-half the length of the line across the entrance, the waters of the indentation shall be regarded as inland waters; if otherwise, the waters of the indentation shall be regarded as open sea.

*"Harbors (Ports)*

"In front of harbors the outer limit of inland waters is to embrace an anchorage reasonably related to the physical surroundings and the service requirements of the port, and, absent contrary evidence, may be assumed to be the line of the outermost permanent harbor works.

*"River Mouths*

"Where rivers empty into the sea, the seaward limit of inland waters is a line following the general direction of the coast drawn across the mouth of the river whatever its width. If the river flows into an estuary, the rules applicable to bays apply to the estuary.

*"Landmarks*

"Where pronounced headlands exist at tributary waterways, the appropriate landmark is the point of intersection of the plane of ordinary low water with the outermost extension of the natural head-land. Where there is no pronounced headland, the landmark is the point of intersection of the ordinary low-water mark with a line bisecting the angle between the general trend line of the ordinary low-water mark along the open coast and the general trend line of the ordinary low-water mark along the shore of the tributary waterway.

*"Question 3:* The 'ordinary low-water mark on the coast of California' is the intersection with the shoreline (as it exists at the time of survey) of the plane of the mean of all low waters, to be established, subject to the approval of the Court, by the United States Coast & Geodetic Survey from observations made over a period of 18.6 years." Report of Special Master 2–5 (footnotes omitted).

[7] The Submerged Lands Act provides in relevant part:

"AN ACT

"To confirm and establish the titles of the States to lands beneath navigable waters within State boundaries and to the natural re-

within the boundaries of the respective States." § 3 (a).
"Boundaries" includes the seaward boundaries of a State
"as they existed at the time such State became a member
of the Union, or as heretofore approved by the Congress,"
but subject to the limitation that

> "in no event shall the term 'boundaries' . . . be
> interpreted as extending from the coast line more
> than three geographical miles into the Atlantic Ocean
> or the Pacific Ocean, or more than three marine
> leagues into the Gulf of Mexico." § 2 (b).

sources within such lands and waters, to provide for the use and
control of said lands and resources, and to confirm the jurisdiction
and control of the United States over the natural resources of the
seabed of the Continental Shelf seaward of State boundaries.

*"Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled,* That this Act may
be cited as the 'Submerged Lands Act.'

### "TITLE I

#### "DEFINITION

"SEC. 2 [43 U. S. C. § 1301]. When used in this Act—

"(a) The term 'lands beneath navigable waters' means—

.          .          .          .          .

"(2) all lands permanently or periodically covered by tidal waters
up to but not above the line of mean high tide and seaward to a line
three geographical miles distant from the coast line of each such
State and to the boundary line of each such State where in any case
such boundary as it existed at the time such State became a member
of the Union, or as heretofore approved by Congress, extends seaward
(or into the Gulf of Mexico) beyond three geographical miles, and

"(3) all filled in, made, or reclaimed lands which formerly were
lands beneath navigable waters, as hereinabove defined;

"(b) The term 'boundaries' includes the seaward boundaries of a
State or its boundaries in the Gulf of Mexico or any of the Great
Lakes as they existed at the time such State became a member of
the Union, or as heretofore approved by the Congress, or as extended
or confirmed pursuant to section 4 hereof but in no event shall the
term 'boundaries' or the term 'lands beneath navigable waters' be
interpreted as extending from the coast line more than three geo-

"Coast line" is then defined as the composite "line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters." § 2 (c). For States

graphical miles into the Atlantic Ocean or the Pacific Ocean, or more than three marine leagues into the Gulf of Mexico;

"(c) The term 'coast line' means the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters;

.        .        .        .        .

"TITLE II

"LANDS BENEATH NAVIGABLE WATERS WITHIN STATE BOUNDARIES

"SEC. 3 [43 U. S. C. § 1311]. RIGHTS OF THE STATES.—

"(a) It is hereby determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be, and they are hereby, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States or the persons who were on June 5, 1950, entitled thereto under the law of the respective States in which the land is located, and the respective grantees, lessees, or successors in interest thereof;

"(b)(1) The United States hereby releases and relinquishes unto said States and persons aforesaid, except as otherwise reserved herein, all right, title, and interest of the United States, if any it has, in and to all said lands, improvements, and natural resources;

.        .        .        .        .

"SEC. 4 [43 U. S. C. § 1312]. SEAWARD BOUNDARIES.—The seaward boundary of each original coastal State is hereby approved and confirmed as a line three geographical miles distant from its coast line or, in the case of the Great Lakes, to the international boundary. Any State admitted subsequent to the formation of the Union which has not already done so may extend its seaward boundaries to a line three geographical miles distant from its coast line, or to the international boundaries of the United States in the Great Lakes or any other body of water traversed by such boundaries. Any claim heretofore or hereafter asserted either by constitutional provision, statute, or otherwise, indicating the intent of a State so to extend its bounda-

having no previously approved seaward boundaries the Act provides that "[a]ny State admitted subsequent to the formation of the Union which has not already done so may extend its seaward boundaries to a line three geographical miles distant from its coast line . . . ." § 4.

Thus the Act effectively grants each State on the Pacific coast all submerged lands shoreward of a line three geographical miles [8] from its "coast line," derivatively defined in terms of "the seaward limit of inland waters." "Inland waters" is not defined by the Act.

In a later measure related to the Submerged Lands Act, Congress declared that the United States owned all submerged land in the continental shelf seaward of the lands granted to the States. Outer Continental Shelf Lands Act, 67 Stat. 462, 43 U. S. C. § 1331 *et seq.*

The passage of the Submerged Lands Act marked the beginning of a long halt in the proceedings in this case. Depth of California's coastal waters increases very rapidly, and as of May 22, 1953, the date of enactment, it was impractical to drill for oil except close to the shore. By granting to California the mineral rights in the three-mile belt, the Act vested in California all the interests that were then thought to be important, and no further action was taken on the Special Master's Report. That Report was neither adopted, modified, nor rejected

---

ries is hereby approved and confirmed, without prejudice to its claim, if any it has, that its boundaries extend beyond that line. Nothing in this section is to be construed as questioning or in any manner prejudicing the existence of any State's seaward boundary beyond three geographical miles if it was so provided by its constitution or laws prior to or at the time such State became a member of the Union, or if it has been heretofore approved by Congress."

[8] One English, statute, or land mile equals approximately .87 geographical, marine, or nautical mile. The conventional "3-mile limit" under international law refers to three geographical miles, or approximately 3.45 land miles.

by this Court, but was simply allowed to lie dormant. By 1963, however, drilling techniques had improved sufficiently to revitalize the importance of the demarcation line between state and federal submerged lands. The United States filed an amended complaint reviving the Special Master's Report and redescribing the issues as modified by the Submerged Lands Act; both the United States and California filed new exceptions to the Report, and the case is now ready for decision.

The basic contention of the United States is that the Act simply moved the line of demarcation out three miles from the line established by the *California* decree. Therefore, contends the United States, the Special Master's Report on the line of ordinary low water and the outer limit of inland waters as used in the *California* decree is just as relevant now as it was before Congress acted, and, with slight modifications, the line drawn by the Special Master should be taken as the "coast line" for purposes of the Submerged Lands Act. California asserts that whereas the Special Master determined inland waters to be those which the United States would have claimed as such for purposes of international relations, the Submerged Lands Act used the term in an entirely different sense to mean those waters which the States historically considered to be inland—in California's case, those waters which the State considered to be inland at the time it entered the Union. Therefore, according to California, the line drawn in the Special Master's Report was determined under standards wholly foreign to the Submerged Lands Act.

The focal point of this case is the interpretation to be placed on "inland waters" as used in the Act. Since the Act does not define the term, we look to the legislative history.

## II.

### LEGISLATIVE HISTORY REVEALS THAT CONGRESS MEANT TO LEAVE THE DEFINITION OF INLAND WATERS TO THE COURTS.

Two changes relevant for our purposes were made in the bill which became the Submerged Lands Act between the time it was sent to the Senate Committee on Interior and Insular Affairs and the time of its passage.

(1) As first written, the bill defined inland waters to include

> "all estuaries, ports, harbors, bays, channels, straits, historic bays, and sounds, and all other bodies of water which join the open sea."

This definition was removed by the Senate Committee.[9]

(2) The bill originally contained no limitation on the extent of historic boundaries that could be claimed. The provision limiting the extent of boundary claims to no more than three geographical miles from the coastline on the Atlantic and Pacific Oceans and three marine leagues on the Gulf of Mexico was added to the bill on the floor of the Senate in the late stages of the debates.[10]

Removal of the definition for inland waters and the addition of the three-mile limitation in the Pacific, when taken together, unmistakably show that California cannot prevail in its contention that "as used in the Act, Congress intended inland waters to identify those areas which the states always thought were inland waters."[11] By deleting the original definition of "inland waters"

---

[9] S. Rep. No. 133, 83d Cong., 1st Sess., 18.

[10] 99 Cong. Rec. 4116. Senator Anderson proposed a similar amendment while the bill was in committee. Hearings before the Senate Committee on Interior and Insular Affairs on S. J. Res. 13 and other bills, 83d Cong., 1st Sess., 1348 (hereinafter cited as Senate Hearings). After discussion the proposal was voted down, *id.*, at 1416.

[11] Closing Brief of California 14.

Congress made plain its intent to leave the meaning of the term to be elaborated by the courts, independently of the Submerged Lands Act.

In response to substantial objections made in the hearings to the original bill's broad definition of inland waters on grounds that it would prejudice and limit the position which the United States could take in its future conduct of foreign affairs,[12] Senator Cordon, the manager of the bill, recommended and obtained elimination of the definition. The Committee Report which he authored explained:

> "The words 'which include all estuaries, ports, harbors, bays, channels, straits, historic bays, and sounds, and all other bodies of water which join the open sea' have been deleted from the reported bill because of the committee's belief that the question of what constitutes inland waters should be left where Congress finds it. The committee is convinced that the definition neither adds nor takes away anything a State may have now in the way of a coast and the lands underneath waters behind it." S. Rep. No. 133, 83d Cong., 1st Sess., 18.[13]

The committee's understanding that the measure "neither adds nor takes away anything a State may have now in the way of a coast and the lands underneath waters behind it," appears to be an acceptance of "inland waters" as used in the *California* and prior Court opinions, whatever that usage might have been. Various different concepts of inland waters were asserted during the Senate Hearings, based on such elements as the depth of the water,[14] the width of the opening of a coastal indentation,[15] the Boggs formula, and the common designation

---

[12] Senate Hearings 312–315, 1064–1065, 1085, 1304, 1378.

[13] See also Senate Hearings 1285 (remarks of Senator Cordon).

[14] Senate Hearings 275–280.

[15] *Id.*, at 1052.

of bodies of water as bays, sounds, straits, etc.[16]   When it became clear that the question had highly technical aspects (see, *e. g.*, n. 5, *supra*) and was one on which differences would arise, the Senate Committee adopted the expedient solution of leaving the matter just as it had found it, neither accepting nor rejecting any particular rule or formula.[17]   It intended to leave unaffected the judicial view of inland waters and the judicial responsibility for particularizing it.

Reference to Senator Cordon's request to the Senate Committee for deletion of the objectionable clause confirms that understanding.   He said:

> "The matter of inland waters is one that has been defined time and time again by the courts, not, I believe, in any one all-inclusive definition, but it was felt [by those who objected to the definition during the hearings] that the use of these words were [*sic*] an attempted legislative definition of the term 'inland waters,' and it was inadvisable for us in this bill, which is a transfer of title, to attempt to make law in the other field of what is or is not inland water.
>
> "The use of the language, it was felt, would probably raise questions that have not been raised, whereas the present definitions are in the decisions and available to the court."
>
> "Senator MALONE.   The inland waters had a special master for that particular job, did they not, and that is now under consideration, that is, his report is under consideration by the Supreme Court?
>
> "Senator CORDON.   With respect to California, and a portion of California coast; yes." Senate Hearings 1304–1305.

---

[16] *Id.,* at 1374–1380.

[17] *Id.,* at 1380–1385.

Shortly thereafter there follows a virtually conclusive statement:

"Senator CORDON. It was not the chairman's view that we were attempting to draw a line delimiting inland waters, but that *we were using a term that is well known in the law and is defined by the Court in the California case, for instance, and in the Louisiana case, I assume. That line might still be defined,* even though the area may not now have the same legal status as it had before." [18] *Id.,* at 1376. (Emphasis added.)

California fastens on a statement made in the Committee Report with regard to the eliminated definition:

"The elimination of the language, in the committee's opinion, is consistent with the philosophy of the Holland bill to place the States in the position in which both they and the Federal Government thought they were for more than a century and a half, and not to create any situations with respect thereto." S. Rep. No. 133, 83d Cong., 1st Sess., 18.

From this California reasons that "inland waters" must have been intended to encompass all waters which the States "thought" were inland waters, for that is the only way in which the Act can now be interpreted to effectuate fully its supposed "philosophy" of granting to the States all submerged lands within their historic boundaries.

If such a view of the bill's purpose is accepted as of the time that the Committee Report was written, there is, nonetheless, no inconsistency whatsoever between that

---

[18] In the later debates, Senator Cordon answered an assertion that the committee had rejected the Boggs formula by saying, "The committee, as I recall, and I think I am correct, neither accepted nor rejected the Boggs formula or any other formula." 99 Cong. Rec. 2633. And see the material quoted in n. 23, *infra.*

purpose and a legislative intent to leave the definition of inland waters to the courts without restriction; at that time the limitation on boundary claims had not yet been incorporated into the Act; thus as the Act was then written, States could have claimed all submerged lands within their historic boundaries, no matter how "inland waters" was defined. The definition would have affected only those States which, not having adequate pre-existing seaward boundaries, chose to extend their boundaries three miles from the coastline pursuant to § 4 of the Act. As stated by Senator Cordon during the Hearings,

"this bill has two approaches to a determination of the area of its application. The first approach is that of the boundaries of the States when they came into the Union; second, an election to any State that has not done so to extend its boundary 3 geographical miles from its present coastline, as that term is described in the present tense in the bill." Senate Hearings 1374.

Only with the adoption of the three-mile limitation on the Atlantic and Pacific Oceans and the three-league limitation in the Gulf of Mexico did the interpretations of historic boundaries and inland waters become operationally related, and any inconsistency thus created between the limitation and the prior philosophy of the Act shows only that, to the extent the limitation would come into play, the philosophy was modified.[19] This amendment was one of very few made to the bill as reported by the Senate Committee, and came as the result of continuous criticism throughout the course of the debates that the extent of the grant was indefinite,[20] and that coastal States could engage in a "claiming race"[21] for submerged lands.

---

[19] See Senate Hearings 1415 (remarks of Senator Cordon).

[20] See, e. g., 99 Cong. Rec. 2881, 2916, 3038–3040, 3549–3564, 3655–3656, 3884–3886, 4085–4086, 4094–4099, 4109.

[21] 99 Cong. Rec. 3655 (remarks of Senator Kilgore).

California points to language stating that adoption of the limitation worked no significant change in the bill. 99 Cong. Rec. 4114–4116 (remarks of Senator Holland). But such statements simply reflect the understanding of the major supporters of the bill that no States other than Texas and Florida (on its Gulf side) had provable claims beyond three miles, and that the claims of those two States did not go beyond three leagues.[22] If such were the case, the limitation could indeed be thought to have no effect, for no state boundaries would run afoul of it, and the vast grant of submerged lands up to three miles along the length of the Atlantic and Pacific coasts, and three leagues, subject to historical proof, in the Gulf of Mexico, would not be impaired. Senator Holland, the author of the bill, proposed the limiting boundary amendment to meet the fears of those Senators who had criticized the indefiniteness of the bill. He explained:

". . . I think the amendment has very little effect. But I am perfectly willing to meet the suggestions of my friends, some of whom have been opponents, and some of whom have been supporters of the joint resolution, to the effect that they would like to have the language more clearly spelled out than it was in the original measure, to the effect that there is no intention whatsoever to grant boundaries beyond 3 geographical miles in either the Atlantic or the Pacific, and that this Congress knows of no possible situation under which greater boundaries are claimed or could be granted in the Gulf of Mexico than 3 leagues; and, in that case, this Congress knows, although this amendment does not indicate it, that

---

[22] 99 Cong. Rec. 2695, 3039 (remarks of Senator Daniel), 2746 (remarks of Senator Holland), 2881 (remarks of Senator Anderson), 2916 (remarks of Senators Anderson and Douglas). Senate Hearings 957 (remarks of Senator Holland).

156

there are but 2 States affected by that particular situation." 99 Cong. Rec. 4116.

Senator Holland was aware of California's expansive inland water claims, but thought them altogether untenable.

"Mr. HOLLAND. My understanding is that California has no provable case beyond 3 miles from its mainland; and that as to the islands, its provable case would be 3 miles around each of the islands. I so stated in the hearings on this matter.

"Mr. DOUGLAS. That is a consummation devoutly to be desired, but I am not at all satisfied that that is what the Senator's joint resolution would accomplish, because the coastline is not fully and clearly defined.

.     .     .     .     .

"Mr. HOLLAND. Under the joint resolution, no such contention could be maintained.

"Mr. DOUGLAS. Is the Senator certain of that?

"Mr. HOLLAND. That is what I believe, and that is what every legal authority I have consulted on the subject believes. Incidentally, the only reason why there was some thought to the contrary was some wording in the original joint resolution, which has been omitted, which would have made the outer boundary of inland waters farther out than that which is now provided by the joint resolution. The joint resolution simply continues the outer boundary of inland waters pursuant to the decisions of the Supreme Court already made. . . .

.     .     .     .     .

"The Senator from Florida knows full well that if the United States Supreme Court should change its mind as to what constituted the outer limits of inland waters, and should change it to a sufficient degree,

it could open up, not only under this joint resolution, but of its own initiative, questions which would reach out much farther than anything we have been talking about here.

"The Senator from Florida believes that the laws, as announced over and over and over again by the Supreme Court, as to the delimitation of inland waters, are sufficiently fixed, definite, and certain so that it would require a complete, cataclysmic change of the Supreme Court's philosophy in that field to afford any hope for an extension of the boundaries of the good State of California so that they would go out beyond the islands as to all areas contained within an outer line. There is no way for us to fore-close the Supreme Court from changing its mind. It might change its mind with reference to inland waters and their delimitation. But failing such change, the Senator from Florida cannot see how, under this joint resolution, there could possibly be any serious question affecting California or any other State." 99 Cong. Rec. 2756–2757.

Senator Holland did not wish to foreclose California from arguing (as it has done both here and before the Special Master) that its waters are inland within the appropriate judicial definition, but it was his opinion that no such definition would permit California's claim to all waters shoreward of their remote islands to prevail. Congress could have defined inland waters as it wished for the purely domestic purposes of the Submerged Lands Act. See *United States* v. *Louisiana,* 363 U. S. 1, 30–36. It could have adopted California's theory, or the Special Master's theory, or any other. Instead, it chose to leave the definition of inland waters where it found it—in the Court's hands. The Act does not reveal a particular intent that courts should broadly interpret "inland waters" so as to restore California to its historic expectations re-

gardless of what its expectations might be.[23]  Indeed, if the Court is to draw any inference from the intent and structure of the Act as to how inland waters should be

[23] Several amendments were offered and defeated which would have limited the grant to the international three-mile limit or to three miles from the shoreline around the entire coastal perimeter of the United States, thus cutting off any claims to a three-league limit by the Gulf Coast States.  See 99 Cong. Rec. 4157, 4203, 4473–4478. The reason for the unacceptability of these amendments to the leaders of the measure, largely composed of Senators from the Gulf Coast States, is obvious, and had nothing to do with any particular concept of inland waters.

Senator Douglas introduced amendments specifically designed to prevent States from claiming as inland waters those water areas between the mainland and remote islands.  Section 2 (c), as amended, would have read: "The term 'coast line' means the line of ordinary low water along that portion of the coast *of the main continent* which is in direct contact with the open sea and the line marking the seaward limit of inland waters, *and in the case of any island seaward of such coast, means the line of ordinary low water around such island."*  99 Cong. Rec. 4240.  (Amendments italicized.)  The colloquy leading to the rejection of these amendments is extremely revealing in the total absence of hostility to the basic idea which Senator Douglas was pursuing and the absence of any understanding by the leaders of the measure that it embodied an historical definition of inland waters.

"Mr. DOUGLAS.  Mr. President, this amendment is designed to clear up an ambiguity in the pending joint resolution and to conform to what the distinguished Senator from Florida [Mr. HOLLAND] the author of the joint resolution, stated was its real intention.

"One of the problems connected with the joint resolution is the problem of where the base line is, from which the submerged lands seaward from the low-water mark are to be measured.  Senate Joint Resolution 13 defines this location as the 'coastline,' but it is not precisely certain in my mind or in the mind of the Senator from Oregon [Mr. CORDON] whose interpretation I requested, what is meant by the word 'coastline.'  In the main debate on the joint resolution, I pointed out that this definition might mean 1 of 2 things. First, it might mean, what I hoped it would mean; namely, the shoreline of the main continental land mass and the external limits of inland

defined, the most plausible inference would be that Congress, in adopting the three-mile limitation, must have intended some base line to be used other than one de-

waters; and then, in the case of islands, the shorelines of each of those islands.

"But I pointed out that probably there would be a contrary claim, particularly in the case of California, and that an attempt would be made to define the term 'coastline' as being a line drawn from the main continent out to and along the outer edge of the outer islands lying off the coast. This is a tremendously important subject. It involves very substantial areas, particularly in the case of California. If it is the latter definition which is to be used, then the water between the remote islands—however far out—and the main continental land mass would become inland waters, not external waters, and all the intervening submerged lands would become the property of the coastal State.

.        .        .        .        .

"Mr. LONG. Mr. President, I can understand the argument made by the Senator from Illinois, but I believe his amendment completely fails to reach the objective he is striving to achieve.

"If one examines the testimony of the representative of the Department of State, he will see that it is the position of the State Department of the present administration, as it was also the position of the previous administration, and, so far as I know, of all other administrations, that the marginal sea begins wherever the line of inland waters ends. That is a very simple position to take in the case of a straight coast line, as is the situation with regard to the State of Texas. There the shore line and the coast line are synonymous in almost all instances.

"However, the situation becomes more complicated when we consider a coast having many indentures, islands, sounds, coves, bays, and the like. At present there is a difference of opinion between the State governments and the Federal Government as to precisely where the line of inland waters is located. But it is well agreed, as it has always been agreed, that the marginal sea begins at the point where the line of inland waters ends.

"I should like to apply that definition to the State of Louisiana. I regret that I do not have here a map of Louisiana for the purpose of demonstrating my point, but all who have made a study of the question agree that a body of water known as Chandeleur Sound is

pendent upon each State's subjective concept of its inland waters, for such a limitation would prove to have been none at all, as full acceptance of California's claims in the present case would show.

inland water. In that area there is a large number of islands, each island close to another. It is agreed by both the Federal Government and the State government, and it has always been agreed, that Chandeleur Sound is inland water. The effect of the Douglas amendment would be to make Chandeleur Sound a part of the high seas, although the Federal Government has never contended that Chandeleur Sound was a part of the high seas, and the State government has always claimed it was inland water.

"Likewise, in the case of bays, it is the position of the State Department that bays not wider than 10 miles are inland waters. The distance of 10 miles between headlands across the mouth of a bay marks the place where the marginal sea begins. The amendment offered by the Senator from Illinois would have the effect once again of declaring such a bay to be a part of the high seas, merely because it is wider than 6 miles between headlands.

"Obviously, the Senator from Illinois is submitting his own definition of inland waters. In effect, it is a definition of inland waters which does not have the support of a single State government in the United States; it does not have the support of the State Department; it is a definition that does not meet with the approval of the Department of Justice; it is a definition, in effect, that does not meet with the approval of a single department of either the Federal Government or the State governments.

"There is no authority for accepting the inference of this amendment, namely, that the definition of inland waters is that they begin at the shore line or where 3-mile lines from headlands intersect in a bay. There is no support for this type of amendment, other than that it appeals to the Senator from Illinois.

"The committee has struggled with this problem. The committee struggled with several different formulas for defining inland waters. Originally, the joint resolution provided that inland waters should include all bays, sounds, straits, and estuaries. However, there was some objection to that definition by the Department of Justice. The Department of Justice contended that it would be far more preferable not to attempt to define inland waters, but simply to use the words 'inland waters,' to meet the standard that those words would ordinarily suggest. Therefore, at the suggestion of the Department

## III.

### The Meaning of "Inland Waters" in the Submerged Lands Act Should Conform to the Convention on the Territorial Sea and the Contiguous Zone.

We turn, then, to determining the judicial definition of "inland waters." It immediately appears that the bulk of cases cited by Congressmen during debates on the Submerged Lands Act for the proposition that inland waters have "been defined time and time again by the courts"

of Justice, and I suppose with the support of the Department of State, the words 'including all bays, estuaries, straits, and sounds,' were stricken from the joint resolution.

"I submit that the language of the joint resolution is the best agreement that could be reached, upon the advice of the competent officials of the State Department and the Justice Department, as well as the advice that the committee had available to it from all the witnesses who testified, and therefore we should retain the committee language rather than accept the definition of the Senator from Illinois.

.        .        .        .        .

"Mr. DANIEL. Is it not true that there are some islands off the main continent which are not as far as 3 miles distant, and that this amendment would confuse the situation with reference to them? . . . We would have to apply this amendment instead of the present rule of inland waters which permits both the Nation and the State to measure from the outer line along those islands.

.        .        .        .        .

"Mr. HOLLAND. . . .

"I think I understand what the Senator [Douglas] is trying to attain. What he is trying to attain is in complete accord with the belief of the Senator from Florida, that islands which are far remote from the coast, and clear beyond inland waters by any reasonable conception, have a 3-mile submerged shelf around each of them; and while that fact is clearly shown in the statement of international law furnished to the committee in the last Congress by the Secretary of State at that time, Mr. Dean Acheson, the proposed amendment would not effectuate that situation at all . . . ."

The amendment was defeated 50 to 26. 99 Cong. Rec. 4240–4243.

deal with interior waters such as lakes and rivers, and provide no assistance in classifying bodies of water which join the open sea.[24]   In this latter context no prior case in this Court has ever precisely defined the term.   The 1947 *California* opinion clearly indicated that "inland waters" was to have an international content since the outer limits of inland waters would determine the Country's international coastline, but the Court did not particularize the definition.[25]   It was that task which subsequently led to the appointment of the Special Master.

---

[24] See, *e. g.*, 99 Cong. Rec. 3110–3112 (remarks of Senator Hill).

[25] The 1947 case raised the purely legal question—who owned the lands and mineral rights beneath the marginal sea belt?   In deciding that they belonged to the United States the Court relied heavily on the international responsibilities of the Federal Government.

"But whatever any nation does in the open sea, which detracts from its common usefulness to nations, or which another nation may charge detracts from it, is a question for consideration among nations as such, and not their separate governmental units.   What this Government does, or even what the states do, anywhere in the ocean, is a subject upon which the nation may enter into and assume treaty or similar international obligations." 332 U. S. 19, 35 (footnote omitted).

The opinion also established that landlocked waters not a part of the open sea are not part of the marginal belt, and belong to the States.   The only problem remaining in the way of actually fixing the location of the marginal belt, and hence the dividing line of ownership between the State and the United States, was that of determining where the open sea ends and landlocked waters begin.   The·Court specifically left that question unresolved.   It is precisely that problem of defining what constitutes open sea and what constitutes inland waters which we must decide· in the present case.

Resolution of that question will (1) determine for the present the location of the marginal belt which we claim against other nations, and (2) define the areas within which ships of foreign nations have no right of innocent passage.   Unquestionably, the definitions of what constitutes open sea and inland waters is, to borrow the words of the 1947 opinion, "a subject upon which the nation may enter into and assume treaty or similar international obligations."   Negotiations at

The Special Master found that there was no internationally accepted definition for inland waters and decided, in those circumstances, that it was the position which the United States took on the question in the conduct of its foreign affairs which should be controlling. He considered the relevant date on which to determine our foreign policy position to be the date of the *California* decree, October 27, 1947. He therefore rejected the assertion that letters from the State Department written in 1951 and 1952 [26] declaring the then present policy of the United States were conclusive on the question before him. At the same time that decision required the Special Master to consider a great many foreign policy materials dating back to 1793 in an attempt to discern a consistent thread of United States policy on the definition of inland waters. He ultimately decided that as of 1947 the United States had taken the position that a bay was inland water only if a closing line could be drawn across its mouth less than 10 miles long enclosing a sufficient water area to satisfy the Boggs formula.[27]

Since the filing of the Special Master's Report the policy of the United States has changed significantly. Indeed it may now be said that there is a settled international rule defining inland waters. On March 24, 1961, the

The Hague beginning in 1930 were directed to just that end, and the Convention on the Territorial Sea and the Contiguous Zone, to which we became a party in 1961, now establishes rules for separating the open sea from inland waters.

[26] Letter from Acting Secretary of State Webb to Attorney General McGrath, November 13, 1951, Senate Hearings 460; letter from Secretary of State Acheson to Attorney General McGrath, February 12, 1952, Senate Hearings 462.

[27] See n. 5, *supra.* Neither the Special Master nor the United States treated the Boggs formula as having been the "definitive" United States position. The Special Master recommended it as an "appropriate technical method" for measuring the sufficiency of the depth of bays. Report of Special Master 26.

United States ratified the Convention on the Territorial Sea and the Contiguous Zone (T. I. A. S. No. 5639) and on September 10, 1964, when the requisite number of nations had ratified it, the Convention went into force. For nations which do not use a straight-base-line method [28] to define inland waters (see *United Kingdom* v. *Norway*, [1951] I. C. J. Rep. 116), the Convention permits a 24-mile maximum closing line for bays and a "semicircle" test for testing the sufficiency of the water area enclosed. The semicircle test requires that a bay must comprise at least as much water area within its closing line as would be contained in a semicircle with a diameter equal to the length of the closing line. Unquestionably the 24-mile closing line together with the semicircle test now represents the position of the United States.[29]

The United States contends that we must ignore the Convention on the Territorial Sea and the Contiguous Zone in performing our duty of giving content to "inland waters" as used in the Submerged Lands Act, and must restrict ourselves to determining what our decision would have been had the question been presented to us for decision on May 22, 1953, the date of enactment. At that time there was no international accord on any definition of inland waters, and the best evidence (although strenuously contested by California) of the position of the United States was the letters of the State Department which the Special Master refused to treat as conclusive.

We do not think that the Submerged Lands Act has so restricted us. Congress, in passing the Act, left the responsibility for defining inland waters to this Court.[30] We think that it did not tie our hands at the same time.

---

[28] See n. 34, *infra*.

[29] Letter from Dean Rusk, Secretary of State, to Robert Kennedy, Attorney General, January 15, 1963, II International Legal Materials 527.

[30] See discussion and legislative history, Part II, *supra*.

Had Congress wished us simply to rubber-stamp the statements of the State Department as to its policy in 1953, it could readily have done so itself.[31]   It is our opinion that we best fill our responsibility of giving content to the words which Congress employed by adopting the best and most workable definitions available.   The Convention on the Territorial Sea and the Contiguous Zone, approved by the Senate and ratified by the President,[32] provides such definitions.   We adopt them for purposes of the Submerged Lands Act.   This establishes a single coastline for both the administration of the Submerged Lands Act and the conduct of our future international relations (barring an unexpected change in the rules established by the Convention).   Furthermore the comprehensiveness of the Convention provides answers to many of the lesser problems related to coastlines which, absent the Convention, would be most troublesome.[33]

[31] See 99 Cong. Rec. 2633 (remarks of Senators Long and Cordon).

[32] The Convention was approved by the Senate May 26, 1960, 106 Cong. Rec. 11196, and was ratified by the President March 24, 1961, 44 State Dept. Bull. 609.   See Treaties in Force—January 1, 1965, 263.

[33] In support of the position that we. should ignore the developments in the law and practice of nations respecting the concept of inland waters which have transpired subsequent to the passage of the Submerged Lands Act—a position which the Solicitor General frankly recognized in his oral presentation was not an easy one for the Government to maintain—the United States cites a statement made by Senator Cordon during the hearings.

"Those who prepared the bill over the years took the view—and that is the way the bill is before us—that 'coastline' means the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters.   That is in the present tense.   It is the coastline as of now.   We have confirmed here 3 miles from the coastline as of now. . . .

"If we attempt now to discuss a coastline of 1783, or whenever the Revolutionary War was concluded and the treaty was signed—

California argues, alternatively to its claim that "inland waters" embraces all ocean areas lying within a State's historic seaward boundaries, that if Congress intended "inland waters" to be judicially defined in accordance with international usage, such definition should possess an ambulatory quality so as to encompass future changes in international law or practice. Thus, if 10 years from now the definitions of the Convention were amended, California would say that the extent of the Submerged Lands Act grant would automatically shift, at least if the effect of such amendment were to enlarge the extent of submerged lands available to the States. We reject this open-ended view of the Act for several reasons. Before today's decision no one could say with assurance where lay the line of inland waters as contemplated by the Act; hence there could have been no tenable reliance on any particular line. After today that situation will have changed. Expectations will be established and reliance placed on the line we define. Allowing future shifts of international understanding respecting inland waters to alter the extent of the Submerged Lands Act grant would substantially undercut the definiteness of expectation which should attend it. Moreover, such a view might unduly inhibit the United States in the conduct of its

---

and I do not just now recall the date—if we attempt now to determine a coastline as of then, it would seem to me that we increase our difficulties beyond what, as I understand the bill, we envisioned in the first place, but which we left where they were." Senate Hearings 1354–1355.

That statement was made in reply to a suggestion that a State should have the choice of extending its boundaries three miles from its present coastline or three miles from its coastline as of the time it entered the Union. Senator Cordon's reply expresses his opposition to that idea on the ground that the exact location of the ancient shoreline would be extremely difficult to determine. It reveals no intent to restrict the courts in framing the definitions to be used to determine the present coastline.

foreign relations by making its ownership of submerged lands *vis-à-vis* the States continually dependent upon the position it takes with foreign nations. "Freezing" the meaning of "inland waters" in terms of the Convention definition largely avoids this, and also serves to fulfill the requirements of definiteness and stability which should attend any congressional grant of property rights belonging to the United States.

## IV.

### SUBSIDIARY ISSUES.

Once it is decided that the definitions of the Convention on the Territorial Sea and the Contiguous Zone apply, many of the subsidiary issues before us fall into place.

1. *Straight Base Lines.*—California argues that because the Convention permits a nation to use the straight-baseline method for determining its seaward boundaries if its "coast line is deeply indented and cut into, or if there is a fringe of islands along the coast in its immediate vicinity," California is therefore free to use such boundary lines across the openings of its bays and around its islands.[34] We agree with the United States that the Convention rec-

---

[34] Article 4 of the Convention provides:

"1. In localities where the coast line is deeply indented and cut into, or if there is a fringe of islands along the coast in its immediate vicinity, the method of straight baselines joining appropriate points may be employed in drawing the baseline from which the breadth of the territorial sea is measured.

"2. The drawing of such baselines must not depart to any appreciable extent from the general direction of the coast, and the sea areas lying within the lines must be sufficiently closely linked to the land domain to be subject to the régime of internal waters.

"3. Baselines shall not be drawn to and from low-tide elevations, unless lighthouses or similar installations which are permanently above sea level have been built on them.

"4. Where the method of straight baselines is applicable under the provisions of paragraph 1, account may be taken, in determining particular baselines, of economic interests peculiar to the region con-

ognizes the validity of straight base lines used by other countries, Norway for instance, and would *permit* the United States to use such base lines if it chose, but that California may not use such base lines to extend our international boundaries beyond their traditional international limits against the expressed opposition of the United States. The national responsibility for conducting our international relations obviously must be accommodated with the legitimate interests of the States in the territory over which they are sovereign. Thus a contraction of a State's recognized territory imposed by the Federal Government in the name of foreign policy would be highly questionable. But an extension of state sovereignty to an international area by claiming it as inland water would necessarily also extend national sovereignty, and unless the Federal Government's responsibility for questions of external sovereignty is hollow, it must have the power to prevent States from so enlarging themselves. We conclude that the choice under the Convention to use the straight-base-line method for determining inland waters claimed against other nations is one that rests with the Federal Government, and not with the individual States.

California relies upon *Manchester* v. *Massachusetts,* 139 U. S. 240, for the proposition that a State may draw its boundaries as it pleases within limits recognized by the law of nations regardless of the position taken by the United States. Although some dicta in the case may be read to support that view, we do not so interpret the opinion. The case involved neither an expansion of our

cerned, the reality and the importance of which are clearly evidenced by a long usage.

"5. The system of straight baselines may not be applied by a State in such a manner as to cut off from the high seas the territorial sea of another State.

"6. The coastal State must clearly indicate straight baselines on charts, to which due publicity must be given."

traditional international boundary nor opposition by the United States to the position taken by the State.

2. *Twenty-four-mile Closing Rule.*—The Convention recognizes, and it is the present United States position,[35] that a 24-mile closing rule together with the semicircle test should be used for classifying bays in the United States.[36]   Applying these tests to the segments of Cali-

[35] Letter from Dean Rusk, Secretary of State, to Robert Kennedy, Attorney General, January 15, 1963, II International Legal Materials 527; Brief for the United States in Answer to California's Exceptions 148.

[36] The full text of Article 7 is as follows:

"1. This article relates only to bays the coasts of which belong to a single State.

"2. For the purposes of these articles, a bay is a well-marked indentation whose penetration is in such proportion to the width of its mouth as to contain landlocked waters and constitute more than a mere curvature of the coast.   An indentation shall not, however, be regarded as a bay unless its area is as large as, or larger than, that of the semi-circle whose diameter is a line drawn across the mouth of that indentation.

"3. For the purpose of measurement, the area of an indentation is that lying between the low-water mark around the shore of the indentation and a line joining the low-water marks of its natural entrance points.   Where, because of the presence of islands, an indentation has more than one mouth, the semi-circle shall be drawn on a line as long as the sum total of the lengths of the lines across the different mouths.   Islands within an indentation shall be included as if they were part of the water areas of the indentation.

"4. If the distance between the low-water marks of the natural entrance points of a bay does not exceed twenty-four miles, a closing line may be drawn between these two low-water marks, and the waters enclosed thereby shall be considered as internal waters.

"5. Where the distance between the low-water marks of the natural entrance points of a bay exceeds twenty-four miles, a straight baseline of twenty-four miles shall be drawn within the bay in such a manner as to enclose the maximum area of water that is possible with a line of that length.

"6. The foregoing provisions shall not apply to so-called 'historic' bays, or in any case where the straight baseline system provided for in article 4 is applied."

fornia's coast here in dispute, it appears that Monterey Bay is inland water and that none of the other coastal segments in dispute [37] fulfill these aspects of the Convention test. We so hold.

California asserts that the Santa Barbara Channel may be considered a "fictitious bay" because the openings at both ends of the channel and between the islands are each less than 24 miles.[38] The United States argues that the channel is no bay at all; that it is a strait which serves as

---

[37] The parties stated that Crescent City Bay is no longer an area in dispute.

[38] The United States asserts that "international law recognizes no principle of 'fictitious bays.'" We find it unnecessary to decide that question. The Government states:

"The expression seems to have originated in a proposal by the Committee of Experts, made to the Fifth Session of the International Law Commission, suggesting a 10-mile rule for bays, a general 10-mile limit for straight baselines, providing that baselines should not be drawn to islands more than 5 miles from shore, and limiting baselines to 5 miles in groups of islands or between such groups and the mainland, except that in such a group one opening could be 10 miles. The latter situation was called a 'fictitious bay.' The Special Rapporteur adopted this proposal in an Addendum to the Second Report on the Regime of the Territorial Sea, International Law Commission, Fifth Session, 18 May 1953. English text, U. N. Doc. A/CN.4/61/Add.1, p. 7 and Annex, p. 4. The subject of groups of islands was postponed by the Commission in 1954 (Article 11, *Report of the International Law Commission Covering the Work of Its Sixth Session* (U. N. Doc. A/CN.4/88), p. 42), and there is no special provision on the subject in the Convention on the Territorial Sea and the Contiguous Zone as finally adopted. The Report of the International Law Commission on the Work of Its Eighth Session, p. 45, fn. 1 (U. N. Doc. A/C.6/L.378), makes clear that the original proposal on the subject was an attempt to formulate a rule and not an expression of a rule already in existence." Brief for the United States in Answer to California's Exceptions 149–150, n. 112.

The openings at the ends of the Santa Barbara Channel are 11 miles and 21 miles.

a useful route of communication between two areas of open sea and as such may not be classified as inland waters.[39]

By way of analogy California directs our attention to the Breton and Chandeleur Sounds off Louisiana which the United States claims as inland waters, *United States* v. *Louisiana,* 363 U. S. 1, 66–67, n. 108. Each of these analogies only serves to point up the validity of the United States' argument that the Santa Barbara Channel should not be treated as a bay. The Breton Sound is a *cul de sac.* The Chandeleur Sound, if considered separately from the Breton Sound which it joins, leads only to the Breton Sound. Neither is used as a route of passage between two areas of open sea. In fact both are so shallow as to not be readily navigable.[40] California also points to the Strait of Juan de Fuca. That strait is not claimed by the United States as a "fictitious bay" and it does not connect two areas of open sea.

Evidence submitted to the Special Master on the extent of international use made of the Santa Barbara Channel was sparse. What evidence there was indicated the usefulness of the route, but did not specify whether the ships so using it were domestic or international.[41] California

[39] See Letter from Acting Secretary of State Webb to Attorney General McGrath, November 13, 1951. Senate Hearings 460. See also Senate Hearings 1084–1085 (remarks of Jack B. Tate).

[40] The depth in general ranges between 6 and 12 feet according to Coast and Geodetic Survey Chart No. 1270, but there is no passage as much as 12 feet deep connecting the ends of the sounds. The sounds are "navigable waters" in the legal sense even in the parts too shallow for navigation. See *United States* v. *Turner,* 175 F. 2d 644, 647, cert. denied, 338 U. S. 851.

[41] Testimony before the Special Master indicated that the channel provided a substantial amount of protection from the rough seas of the Pacific and was used as an alternate route of passage for ships "coming down from the Pacific Northwest." (Tr. 595. See also Tr. 608.) In its appendix, p. 57, California points to a statement in

now regards the point as important, for under international law as expressed in the *Corfu Channel Case*, [1949] I. C. J. Rep. 4, the International Court of Justice held that a country could not claim a strait as inland water if, in its natural state, it served as a useful route for *international* passage. We do not consider the point of controlling importance. The United States has not in the past claimed the Santa Barbara Channel as inland water and opposes any such claim now. The channel has not been regarded as a bay either historically or geographically. In these circumstances, as with the drawing of straight base lines, we hold that if the United States does not choose to employ the concept of a "fictitious bay" in order to extend our international boundaries around the islands framing Santa Barbara Channel, it cannot be forced to do so by California. It is, therefore, unnecessary to reinstitute proceedings before a master to determine the factual question of whether the passageway is internationally useful.

3. *Historic Inland Waters.*—By the terms of the Convention the 24-mile closing rule does not apply to so-called "historic" bays.[42] Essentially these are bays over which a coastal nation has traditionally asserted and maintained dominion with the acquiescence of foreign nations.[43] California claims that virtually all the waters here in dispute are historic inland waters as the term is internationally understood. It relies primarily on an interpretation of its State Constitution to the effect that

Davidson, Coast Pilot of California, Oregon, and Washington (4th ed. 1889), p. 53, "The islands break the force of the large westerly swell of the Pacific along the coast-line, and in winter afford good lee from the full force of the southeast gales."

[42] See Art. 7, § 6, *supra*, n. 36.

[43] See generally, Juridical Regime of Historic Waters, Including Historic Bays, U. N. Doc. A/CN.4/143 (1962).

the state boundaries run three miles outside the islands and bays,[44] plus several court decisions which so interpret it as applied to Monterey, Santa Monica, and San Pedro Bays.[45]   The United States counters that, as with straight base lines, California can maintain no claim to historic inland waters unless the claim is endorsed by the United States.   The Special Master found it unnecessary to decide that question because, on the evidence before him, he concluded that California had not traditionally exercised dominion over any of the claimed waters.

Since the 24-mile rule includes Monterey Bay, we do not consider it here.   As to Santa Monica Bay, San Pedro Bay, and the other water areas in dispute, we agree with the Special Master that they are not historic inland waters of the United States.

California contends that two studies of the criteria for determining historic waters have been made since the Special Master filed his report [46] which show that he applied the wrong standards, thus vitiating his conclusions.   In particular it is said that the Special Master

[44] Article XII of the California Constitution of 1849 described the sea boundary of the State of California as follows:

". . . thence running west and along said boundary line to the Pacific Ocean, and extending therein three English miles; thence running in a northwesterly direction and following the direction of the Pacific Coast to the 42d degree of north latitude, thence on the line of said 42d degree of north latitude to the place of beginning.   Also all the islands, harbors, and bays, along and adjacent to the Pacific Coast."

[45] Ocean Industries, Inc. v. Superior Court, 200 Cal. 235, 252 P. 722 (1927); Ocean Industries, Inc. v. Greene, 15 F. 2d 862 (D. C. N. D. Cal. 1926) (Monterey Bay).   People v. Stralla, 14 Cal. 2d 617, 96 P. 2d 941 (1939) (Santa Monica Bay).   United States v. Carrillo, 13 F. Supp. 121 (1935) (San Pedro Bay).

[46] Historic Bays, U. N. Doc. A/CN.13/1 (1957), and Juridical Regime of Historic Waters, Including Historic Bays, U. N. Doc. A/CN.4/143 (1962).

174

erroneously thought the concept of historic waters to be an exception to the general rule of inland waters requiring a rigorous standard of proof. We find no substantial indication of this in his report.

On the evidence, California's claim that its constitution set a boundary beyond the bays and islands is arguable, but many of the state statutes drawing county boundaries which supposedly run to the limit of the state boundaries cut the other way by indicating a line only three miles from shore.[47] Furthermore, a legislative declaration of jurisdiction without evidence of further active and continuous assertion of dominion over the waters is not sufficient to establish the claim.[48] There is a federal district court opinion, *United States* v. *Carrillo*, 13 F. Supp. 121 (1935), which dismissed federal criminal charges for an offense which took place more than three miles from the shore of San Pedro Bay on the ground that the bay was within California, not federal, jurisdiction; but it is difficult to see this dismissal as an assertion of dominion. In Santa Monica Bay, California did successfully prosecute a criminal offense which took place more than three miles from the shore, *People* v. *Stralla*, 14 Cal. 2d 617, 96 P. 2d 941 (1939). However, the decision stands as the only

---

[47] *E. g.*, for San Diego County, see Cal. Stat. 1850, c. 15, § 2, p. 58; Cal. Stat. 1851, c. 14, § 2, p. 172; Cal. Political Code 1872, §§ 3907, 3944; Cal. Political Code 1923, § 3945; Cal. Stat. 1919, c. 470, § 38, p. 895; Cal. Stat. 1923, c. 160, § 38, p. 361; Cal. Govt. Code § 23137; Cal. Stat. 1947, c. 424, p. 1069. For Los Angeles County, see Cal. Stat. 1850, c. 15, § 3, p. 59; Cal. Stat. 1851, c. 14, § 3, p. 172; Cal. Stat. 1856, c. 46, § 1, p. 53; Cal. Political Code 1872, § 3945; Cal. Stat. 1919, c. 470, § 20, p. 877; Cal. Political Code 1923, § 3927; Cal. Stat. 1923, c. 160, § 20, p. 343; Cal. Govt. Code § 23119; Cal. Stat. 1947, c. 424, p. 1055.

[48] See generally, Juridical Regime of Historic Waters, Including Historic Bays, U. N. Doc. A/CN.4/143, ¶¶ 80–105 (1962).

assertion of criminal jurisdiction of which we have been made aware.[49]

The United States disclaims that any of the disputed areas are historic inland waters. We are reluctant to hold that such a disclaimer would be decisive in all circumstances, for a case might arise in which the historic evidence was clear beyond doubt. But in the case before us, with its questionable evidence of continuous and exclusive assertions of dominion over the disputed waters, we think the disclaimer decisive.

4. *Harbors and Roadsteads.*—The parties disagree as to whether inland waters should encompass anchorages beyond the outer harborworks of harbors. The Convention on the Territorial Sea and the Contiguous Zone (Art. 8) states without qualification that "the outermost permanent harbour works which form an integral part of the harbour system shall be regarded as forming part of the coast." We take that to be the line incorporated in the Submerged Lands Act.

As to open roadsteads used for loading, unloading and anchoring ships, the Convention (Art. 9) provides that such areas should be included in the territorial sea, and, by implication, that they are not to be considered inland waters. We adopt that interpretation.

5. *The Line of Ordinary Low Water.*—Along the California coast there are two low tides each day, one of which is generally lower than the other. The assertion of the United States, with which the Special Master agreed, is that the line of ordinary low water is obtained by taking

---

[49] The United States Attorney for the Southern District of California participated as an *amicus curiae* in the *Stralla* case and supported the position of California. We do not consider this action so significant as to foreclose the United States in the controversy before us. Compare the discussion of actions taken by the Secretary of the Interior in *United States* v. *California,* 332 U. S. 19, 39–40.

the average of all the low tides. California would average only the lower low tides.

We hold that California's position represents the better view of the matter. The Submerged Lands Act defines coastline in terms of the "line of ordinary low water." The Convention (Art. 3) uses "the low-water line along the coast as marked on large-scale charts officially recognized by the coastal State" (*i. e.,* the United States). We interpret the two lines thus indicated to conform, and on the official United States coastal charts of the Pacific Coast prepared by the United States Coast and Geodetic Survey, it is the lower low water line which is marked.

6. *Artificial Accretions.*—When this case was before the Special Master, the United States contended that it owned all mineral rights to lands outside inland waters which were submerged at the date California entered the Union, even though since enclosed or reclaimed by means of artificial structures. The Special Master ruled that lands so enclosed or filled belonged to California because such artificial changes were clearly recognized by international law to change the coastline. Furthermore, the Special Master recognized that the United States, through its control over navigable waters, had power to protect its interests from encroachment by unwarranted artificial structures, and that the effect of any future changes could thus be the subject of agreement between the parties.

The United States now contends that whereas the Submerged Lands Act recognized and confirmed state title within all artificial as well as natural modifications to the shoreline prior to the passage of the Act, Congress meant to recognize only natural modifications after the date of the Act. The Act, however, makes no specific reference to artificial accretions, and nowhere in the legislative history did anyone focus on the question.[50] The United

---

[50] See, *e. g.,* 99 Cong. Rec. 2697 (remarks of Senator Cordon); Senate Hearings 1344–1345, 1353–1358, 1374.

States points by analogy to the rule of property law that artificial fill belongs to the owner of the submerged land onto which it is deposited. *Marine R. & Coal Co.* v. *United States,* 257 U. S. 47, 65. We think the situation different when a State extends its land domain by pushing back the sea; in that case its sovereignty should extend to the new land, as was generally thought to be the case prior to the 1947 *California* opinion.[51] The considerations which led us to reject the possibility of wholesale changes in the location of the line of inland waters caused by future changes in international law, *supra,* pp. 166–167, do not apply with force to the relatively slight and sporadic changes which can be brought about artificially. Arguments based on the inequity to the United States of allowing California to effect changes in the boundary between federal and state submerged lands by making future artificial changes in the coastline are met, as the Special Master pointed out, by the ability of the United States to protect itself through its power over navigable waters.

With the modifications set out in this opinion we approve the recommendations of the Special Master. The parties, or either of them, may, before September 1, 1965, submit a proposed decree to carry this opinion into

---

[51] See, *e. g.,* Statement of Robert Moses and the discussion following it. Senate Hearings 137.

The United States points by analogy to judicial interpretations of the Swamp Land Act of 1850, 9 Stat. 519, to the effect that it granted only those lands which were swamp at the date of its passage. However, the terms of that Act were specific: ". . . those swamp and overflowed lands . . . which shall remain unsold at the passage of this act, shall be, and the same are hereby, granted . . ."; and it granted lands sovereignty over which had never been thought to change because the nature of the land changed.

effect, failing which the Court will prepare and enter an appropriate decree at the next Term of Court.

*It is so ordered.*

THE CHIEF JUSTICE and MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, dissenting.

In 1947 in *United States v. California,* 332 U. S. 19, this Court held that the United States had paramount rights in the waters and submerged lands lying adjacent to its coastlines. A Special Master was appointed to apply the rule of that case to segments of submerged land off the mainland of California. In 1953 Congress, believing that this Court's decision unfairly denied to the coastal States submerged lands within their historic boundaries, passed the Submerged Lands Act to upset that decision and restore to the States what Congress believed had historically and rightfully been theirs. The Court today decides this case on the basis of the 13-year-old Master's Report which attempted to carry out the 1947 *California* opinion and decree. Instead of relying on that 1952 Report, which was based on a decision which Congress in 1953 forcefully and emphatically rejected in the Submerged Lands Act, I would refer this case to a Master for new hearings, findings and recommendations to be made in light of the Submerged Lands Act, the controlling statutory law as it now exists.

## I.

The issue in this case is whether California or the United States is the owner of seven segments of land lying under the sea off the mainland of California.[1] Most

---

[1] See Appendix A.

of the segments lie under or outside what are called bays in popular usage, and as to them the question is whether and how much of the land underlying them and the marginal sea beyond belongs to California.[2] One large segment, which also includes two of the bays in issue, touches the sea opposite a chain of islands which lie up to approximately 50 miles off the mainland, separated by the Santa Barbara Channel, the San Pedro Channel, and the Gulf of Santa Catalina.[3] As to that segment, California claims ownership of the sea bottom under the water separating the islands from the mainland and three miles beyond the islands, while the United States argues that California owns only a strip three geographic miles wide around each island and one extending three geographic miles from the mainland shore, with the intervening submerged land all belonging to the Federal Government. In order to understand the present contentions of the parties, it is necessary to go back to the years before 1945, the year in which the dispute of which the present controversy is an aftermath came before this Court.

For many decades some of the States bordering on the sea had claimed dominion over water and submerged lands lying off their shores. Their claims usually were stated as extending into the open sea a distance of three statute

---

[2] See Appendix B, which shows Monterey Bay, one of the bays in question. California claims that all the submerged land and waters landward of the line drawn across the headlands are inland waters within the historic coastline of the State, and that its historic boundary, the outer limit of its rights under the Submerged Lands Act, extends three miles seaward of that line. The United States claims that California owns only a belt of submerged lands within three miles of the low-water mark of the mainland shore.

[3] See Appendix C. California claims all the submerged land between the line drawn along the islands from the mainland, and a belt of marginal sea three miles to seaward of that line. The United States contends that California is entitled only to a belt within three miles of the mainland shore and three miles around each of the islands.

miles, three geographic miles, or three marine leagues from their "coast lines." [4]   But "coast line," as the term was used in many such claims, and as it.is used in modern geographic descriptions, does not mean simply the low-water mark of the mainland shore; rather, it means a legally recognized line which follows the low-water mark of the shore where the shore is relatively straight and facing open sea, and which at other points follows the recognized outside limits of "inland waters," which flow into the sea or form indentations in the land.   Such "inland waters" may include certain estuaries, bays and harbors, and waters between a mainland and offshore islands.

For many years the Federal Government raised no objection to the various States' claims that their boundaries, including claims to the marginal sea, extended outward for various distances into the sea.   However, by the 1930's it became apparent that the submerged lands off the shores of certain States contained rich and valuable oil reserves and other natural resources.   In the late 1930's it was for the first time asserted that in spite of the States' historic claims the United States, and not the respective coastal States, was the owner of all submerged lands lying both within and without the three-mile limits, except for land under "inland waters." [5]   California and other States claimed that they were the owners of all submerged lands within their historic boundaries dating back to their respective admissions to the Union, including of course both historic inland waters and a three-mile or three-league strip of marginal sea beyond. To settle this controversy the United States in 1945

---

[4] One geographic (or marine or nautical) mile equals approximately 1.15 statute (or land or English) miles.   One marine league equals three geographic miles or approximately 3.45 statute miles.

[5] See S. Rep. No. 133, 83d Cong., 1st Sess. (hereafter cited as Senate Report), 21.

brought in this Court the action against California of which today's decision is an aftermath, alleging that the United States was "the owner in fee simple of, or possessed of paramount rights in and powers over, the lands, minerals and other things of value underlying the Pacific Ocean, lying seaward of the ordinary low water mark on the coast of California and outside of the inland waters of the State, extending seaward three nautical miles . . . ." California objected immediately that the complaint was vague because the Government did not make clear how broadly or narrowly it defined "inland waters." California also answered that its historic boundaries as set out in its constitution in 1849, approved when it was admitted to the Union, included not only a strip out to three miles from its coast, but also "all the islands, harbors, and bays along and adjacent to the Pacific coast," and that therefore "all lands under all navigable waters within the boundaries of the State" belonged to it. This Court then held in 1947 in *United States* v. *California,* 332 U. S. 19, that the United States and not California had paramount rights in all the waters and submerged lands within the three-mile belt of marginal sea "outside of the inland waters." 332 U. S. 804, 805. See also *United States* v. *Louisiana,* 339 U. S. 699; *United States* v. *Texas,* 339 U. S. 707. As for the problem of deciding what were inland waters and what were not, and of drawing an exact demarcation between the inland waters and a three-mile strip of marginal sea, this Court said that "there is no reason why, after determining in general who owns the three-mile belt here involved, the Court might not later, if necessary, have more detailed hearings in order to determine with greater definiteness particular segments of the boundary." 332 U. S., at 26.

It was not long before such hearings did become necessary, for the United States and California found themselves in sharp disagreement as to what the term "inland

waters" meant when applied to specific segments of the California coast. Both parties assumed at that time, long before the Submerged Lands Act was passed, that the term was to be given a content derived from the usage of international law and the United States' foreign relations, since the *California* decision in upholding the claim of the United States to land under the three-mile belt of marginal sea had relied on the necessity of federal protection and control of the territorial seas as an incident of national sovereignty. But the doctrines of international law were so confused and contradictory as to exactly what measurements a bay must have to be inland water, and under what conditions a channel between islands and the mainland was inland water, that both sides were able to find precedents supporting them. This Court therefore submitted the case to a Special Master to make findings of fact and recommendations of law as to whether each of seven segments of submerged land off the mainland of California, the same seven now in dispute, should be treated as "inland waters" within the meaning of the *California* opinion and decree, and therefore the property of the State.[6] 342 U. S. 891. On October 14, 1952, the Master filed his Report, 344 U. S. 872, in which he said he assumed that the test of whether the land in dispute belonged to California depended on whether it was inland water "by (1) any customary, generally recognized rule of international law . . . or by (2) effective assertion by the United States on its own behalf in its international relations." He thus considered any claim based on the historic boundaries of the State as totally irrelevant, as having been rejected in this Court's 1947 opinion, and he ruled in substance that the United States was the owner of the submerged lands in question to the extent it claimed.

---

[6] The Master was asked also to consider what criteria were proper for measuring the ordinary low-water mark on the shore.

Whether the test he used correctly interpreted the opinion need not concern us at this point. California of course filed exceptions, as did the United States. Then in 1953 Congress entered the picture by passing the Submerged Lands Act, and for more than 10 years, during which neither of the parties took any further steps in this Court and the Master's Report lay dormant, it appeared that the Act of Congress had determined the dispute.

The Submerged Lands Act of 1953 [7] gave to the coastal States "title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters . . . ." [8] It defined "lands beneath navigable waters" as all submerged land lying within three geographic miles seaward of the "coast line" of the State,[9] which was in turn stated to be the low-water mark where the mainland was in direct contact with the open sea, and elsewhere the seaward limit of the "inland waters." [10] The Act said, in language of extreme importance to the resolution of the present dispute at the present time, that each State was to have title to submerged lands "to the boundary line of each such State" [11] with the term "boundaries" meaning "the seaward boundaries of a State . . . *as they existed at the time such State became a member of the Union, or as heretofore approved by the Congress,*" [12] up to a limit of three geographic miles from the coastline in the Atlantic and Pacific Oceans, and three leagues from the coastline in the Gulf of Mexico.[13] Thus each State was given title to the submerged lands

---

[7] 67 Stat. 29, 43 U. S. C. §§ 1301–1315 (1958 ed.).

[8] § 3, 67 Stat. 29, 30, 43 U. S. C. § 1311 (1958 ed.).

[9] § 2 (a)(2), 67 Stat. 29, 43 U. S. C. § 1301 (a)(2) (1958 ed.).

[10] § 2 (c), 67 Stat. 29, 43 U. S. C. § 1301 (c) (1958 ed.).

[11] § 2 (a)(2).

[12] § 2 (b), 67 Stat. 29, 43 U. S. C. § 1301 (b) (1958 ed.). (Emphasis supplied.)

[13] *Ibid.*

off its shores out as far as its boundaries at the time the State entered the Union, which were stated not to go more than three miles (or leagues) beyond its "coast line." The "coast line" was the outer limit of its "inland waters." The basic question here is whether the State's "coast line" as the term is used in the Act is to be determined by looking at the State's historic boundaries when it entered the Union, or by the standard used by the Master in carrying out the *California* decree.

For 10 years after the Act was passed transferring title to these submerged lands to the States, no further action in the case pending in this Court was taken by either the United States or California.[14] California's original claim that these bays and channels were inland waters within the meaning of this Court's decree had ceased to be so important, since the States had been given title to all the submerged lands out to their historic boundaries, including recognition of their claims to three miles or leagues of the marginal sea. After 10 years had passed, however, exploitation of undersea oil resources had become possible in deep water at great distances from the mainland, and the United States raised this present dispute with California concerning where the outer limit of the submerged land given the State by the Submerged Lands Act lay. The United States contends that this depends on the location of the "coast line" since the State's added rights extended three miles from the "coast line," and that the location of the "coast line" depends in turn on the location of the seaward edge of the "inland waters," which the United States argues should be measured according to the definition of "inland waters" used by the Master in his hearings in the *California* case; the United States further argues that the report of the Master settled the case, and that the subsequent passage of the Sub-

---

[14] The constitutional power of Congress to enact the Submerged Lands Act was upheld in *Alabama* v. *Texas,* 347 U. S. 272.

merged Lands Act had no effect on the correctness of the standard he used. California replies that since the stated purpose of the Act was to restore the States' claims to the submerged lands within their historic boundaries, which included all waters within the States' boundaries as inland waters and three miles beyond into the territorial sea, the "coast line" or seaward edge of the "inland waters" was to be defined in terms of what a State had historically claimed was its coastline, the line from which it had measured its boundary, by its three-mile claim to the marginal sea. In other words, the United States proposes that in measuring California's submerged lands even under the Submerged Lands Act this Court should start with a line of internationally defined "inland waters" as applied by the Master in carrying out the decree in the *California* case, and measure three miles out. California argues that since the effect of the *California* case was rejected by the Submerged Lands Act, this Court should look only to the Submerged Lands Act for the governing law and in defining the State's boundary should start with the coastline as historically recognized when the State was admitted to the Union, from which the State measured its three-mile claim of marginal sea, and measure three miles outward from that historic coastline, thus restoring the State's historic boundaries. I think that the language and purpose of the Submerged Lands Act of 1953 show that California is right.

## II.

This Court's 1947 holding precipitated one of the most hotly contested political issues of the post-war decade. Critics of the decision said that it had come as a complete surprise and had effectively taken away from the coastal States what they and others had thought from the time they entered the Union and before belonged to them. In 1952 a resolution passed both houses of Congress designed to "restore" to the States the submerged lands which they

had thought they owned before the *California* decision.[15] Many opposed this bill as a "give away" of the federal public domain, and President Truman prevented the bill's passage by vetoing it.[16] Even in so doing, however, he recognized frankly that "Even so careful and zealous a guardian of the public interest as the late Secretary of the Interior, Harold Ickes, at first assumed that the undersea lands were owned by the States." [17]

The controversy over whether to upset the Federal Government's title which this Court had declared in the 1947 decision continued, however, and on January 9, 1953, Senator Holland of Florida on behalf of himself and 39 other Senators introduced a bill, Senate Joint Resolution 13,[18] which was identical with the bill which had passed the previous year and which, with various amendments, passed both houses of Congress, was signed by President Eisenhower, and became law as the Submerged Lands Act of 1953. The stated purpose of the law as enacted was

> "To confirm and establish the titles of the States to lands beneath navigable waters *within State boundaries* and to the natural resources within such lands and waters . . . and to confirm the jurisdiction and control of the United States over the natural resources of the seabed of the Continental Shelf *seaward of State boundaries."* [19]

---

[15] S. J. Res. 20, 82d Cong., 2d Sess. For a summary of earlier proposed legislation dealing with submerged lands, see *United States v. Louisiana,* 363 U. S. 1, 6, n. 4.

[16] Message from the President, May 29, 1952, S. Doc. No. 139, 82d Cong., 2d Sess.

[17] *Id.,* p. 2.

[18] S. J. Res. 13, 83d Cong., 1st Sess. A substantially identical bill, H. R. 2948, 83d Cong., 1st Sess., was introduced in the House.

[19] 67 Stat. 29. (Emphasis supplied.) The latter clause, dealing with the outer Continental Shelf, was added to the original bill in committee.

As the first witness to testify at the Senate committee hearings on his bill, Senator Holland said that

> "the general purpose of Senate Joint Resolution 13 is to recognize, confirm, establish, and vest in the several States—and this means all 48 of them—the submerged lands and the natural resources therein within their respective boundaries, subject to the exercise of all of the powers of regulation of the Federal Government for the purpose of commerce, navigation, national defense, and international affairs, none of which Federal powers include any property rights. This joint resolution will confirm to the maritime States—of which there are 20—the rights which they had respectively enjoyed since the founding of our Nation and up to the date of the decision in the California case, in *their offshore lands and waters which lie within their constitutional boundaries.*" [20]

Its object, he said, was "restoring to the States their plenary rights, property, jurisdiction, and control which they exercised without question for 150 years over the areas lying within State boundaries." [21]  It dealt only, he said, with the area within "the States' historic or constitutional boundaries." [22]  Those who testified in favor of the bill stated their objective the same way.  Thus Secretary of the Interior McKay said:

> "I do believe that the national interest would be best served by restoring to the various States the coastal offshore lands to the limits of the line marked

---

[20] Hearings before the Senate Committee on Interior and Insular Affairs on S. J. Res. 13 and Other Bills, 83d Cong., 1st Sess. (hereafter cited as Senate Hearings), 31–32.  (Emphasis supplied.)

[21] Senate Hearings 49.

[22] *Id.*, 34.

by the historical boundaries of each of the respective States." [23]

There can be no doubt, I believe, and I do not understand the Court to question, that, as proposed to the Senate Committee on Interior and Insular Affairs by Senator Holland and others, the bill which became the Submerged Lands Act unquestionably was intended to give the States title to all the offshore lands going out at least as far as the respective States' historic boundaries. A brief filed in this Court in another case shows that in the reported deliberations on the bill the term "historic State boundaries" was used 813 times, "original boundaries" 121 times, and "traditional" boundaries 114 times.[24] Since I take it that the Court concedes that this was the original purpose, see *ante,* pp. 153–154, I shall not bother to set forth all the statements of proponents of the bill at the Senate hearings, as well as at the House hearings, which stated flatly that this was its purpose.

### III.

We start then from the conceded fact that the bill as originally introduced gave California title to all the submerged lands off its shore out to its historic boundaries, whatever they might prove to be. The Court, however, pins its case for denying California those historic boundaries on what it calls two "relevant," indeed fundamental, changes, *ante,* p. 150, made in the bill prior to its passage, which the Court says show that the bill's sponsors suddenly altered their intent and decided instead of restoring to California and other States mineral rights within their historic boundaries, to limit them to a three-mile or three-

---

[23] *Id.,* 512. Unlike the Truman Administration, the Eisenhower Administration supported legislation to grant mineral rights in submerged offshore lands to the adjacent States.

[24] Brief of the State of Texas, *United States* v. *Louisiana,* 363 U. S. 1, p. 50.

league strip of marginal waters along "coast lines" which were to be restrictively defined according to current policies of international relations adhered to by the State Department. A study of the legislative history convinces me that in making the two changes on which the Court relies, the Senators intended in no way to alter the purpose of the original Holland bill to restore to the States all the waters and submerged lands within their historic constitutional boundaries. They expressly, vigorously and repeatedly avowed that the original purpose was unchanged.

### A. THE REMOVAL OF THE DEFINITION OF "INLAND WATERS."

As originally drafted, § 2 of the Holland bill defined "inland waters," which extended to the "coast line," as including

> "all estuaries, ports, harbors, bays, channels, straits, historic bays, and sounds, and all other bodies of water which join the open sea." [25]

This definition would of course unquestionably give California title to submerged lands lying under all its historically recognized bays and straits as part of California's "inland waters," quite apart from the fact that they might also lie within California's historic boundary of inland waters plus marginal sea. The Deputy Legal Adviser of the State Department testified that such a legislative definition of inland waters, even though limited to the purpose of the bill of affecting property rights between the United States and the States, "a purely domestic matter," [26] might possibly embarrass the State Department in its foreign relations if the Department asserted a different definition of the words "inland waters" in its rela-

---

[25] See Senate Report 14.

[26] Senate Hearings 1378 (Senator Cordon). Compare *United States v. Louisiana,* 363 U. S. 1, 33.

tions with foreign nations.[27] The Attorney General warned that to attempt to define the coastline in a few words might increase rather than diminish litigation.[28] As a result, Senator Cordon, the Acting Chairman of the Committee, at the conclusion of the hearings quoted the language defining "inland waters" for purposes of the Act and said:

> "That language was objectionable to the State Department and to the Department of Justice. That isn't, in itself, in my opinion, reason to strike it, but I am of the opinion that the objections were sound. The matter of inland waters is one that has been defined time and time again by the courts, not, I believe, in any one all-inclusive definition, but it was felt that the use of these words were an attempted legislative definition of the term 'inland waters,' and it was inadvisable for us in this bill, which is a transfer of title, to attempt to make law in the other field of what is or is not inland water." [29]

At another point he explained that the language was struck simply because

> "It was sought not to get into that field because you were in a field then where, in our attempts to take care of a purely domestic matter, we might be putting the United States on record with a precedent which we intended only to apply domestically but which might be applied internationally." [30]

He emphasized that

> "The elimination of the language still follows what the Chair understands to be the philosophy of the

---

[27] *Id.*, 1053 (Deputy Legal Adviser Tate). Compare *United States v. Louisiana*, 363 U. S. 1, 30–32.

[28] *Id.*, 926. Attorney General Brownell suggested that a line be drawn on a map as part of the bill. He said that if the Committee tried "to describe in words bays or other characteristics of the coast, unnecessary litigation will almost surely result." *Ibid.*

[29] Senate Hearings 1304.

[30] *Id.*, 1378.

bill, that we are putting the States where they thought they were, and not attempting now to create either a situation in law or a basis for a rule of evidence that may or may not have been sound when the States came into the Union." [31]

Senator Daniel of Texas, a leading advocate and sponsor of the bill, said:

"I agree fully with the chairman that the striking of these words was not done in any manner to prejudice the rights of the States . . . . I just want to state that for the record, if this record is ever used in the future." [32]

Senator Cordon, who had proposed the change, replied:

"I appreciate the statement of the Senator, and I concur in it, so far as the action taken here is concerned." [33]

And Senator Anderson, another member of the Committee reporting the bill, agreed:

"I subscribe fully to what the chairman said quite awhile ago in pointing out that this bill does not seek to take away from or add to the position of these States as they came into the Union." [34]

When the bill was reported out of committee and presented to the Senate, its supporters made clear that the Committee had made no change in its original objective of restoring to the States everything within their historic boundaries. Senator Holland said it was an "obvious fact" [35] that the bill was "giving to the States that which, without question, was enjoyed by them for 150 or 160

---

[31] *Id.*, 1383.
[32] *Id.*, 1384.
[33] *Ibid.*
[34] *Id.*, 1385.
[35] 99 Cong. Rec. 2746.

years, namely, the ownership of everything within State boundaries, and reserving to the Federal Government everything beyond that." [36]  Senator Cordon expressed his understanding that

"The boundaries of the States cannot be changed by Congress without the consent of the States. We cannot do anything legislatively in that field, and we have not sought to do so in this measure.

"I think that answers all and every one of the discussions with reference to boundary lines of the States, including whether they are measured from low water, high water, inland water, or some island." [37]

And Senator Holland said:

"By way of a brief summary, the general purpose of this measure as reported by the Interior and Insular Affairs Committee is to recognize, confirm, establish, and vest in and assign to the respective States the title and ownership of the lands and resources beneath navigable waters *within their respective boundaries* . . . ." [38]

And Senator Daniel explained:

"Until recently the Federal Government never thought it owned these lands, and even until now it has never possessed or used them. The lands are still in the possession of the States . . . . The passage of the pending proposed legislation will simply permit the States to keep what they have always had since the foundation of the Union." [39]

If that were not enough to show that the removal of the definition of inland waters from § 2 of the bill as a

---

[36] *Ibid.*

[37] *Id.*, 2634.

[38] *Id.*, 2744.  (Emphasis supplied.)

[39] *Id.*, 2830.

courtesy to the State and Justice Departments was to have no substantive effect, the Senate Committee said at the beginning of its report on its version of the bill:

> "The committee wishes to emphasize that, as will be seen from comparison with the measure as introduced, the changes are primarily those of form and language, and the committee amendment is consistent throughout with the philosophy and intent of Senate Joint Resolution 13 as introduced. *The only change of substance is found in section 9,* in which the jurisdiction and control of the Federal Government over the natural resources of the seabed of the Continental Shelf seaward of historic State boundaries is confirmed." [40]

Thus the continued intention to confer on the States all submerged lands within their "historic boundaries" was again reiterated. And in a specific reference to the elimination of the definition of inland waters from § 2, the Committee Report said that the words had been deleted

> "because of the committee's belief that the question of what constitutes inland waters should be left where Congress finds it. The committee is convinced that the definition *neither adds nor takes away anything a State may have now in the way of a coast* and the lands underneath waters behind it." [41]

The Committee had before it the report of the Special Master in this very case [42] and did not adopt his criteria, based on the *California* decision, for determining inland waters, criteria which included the Boggs formula for determining bays, a formula which many Senators indicated they disapproved and which the Committee Report specifically stated it did not mean to establish as the law.

---

[40] Senate Report 2. (Emphasis supplied.)

[41] *Id.*, 18. (Emphasis supplied.)

[42] Senate Hearings 1211–1229.

Clearly the position of the Committee was that it really cared only about restoring to the States their claims to submerged lands within their historic boundaries, which of course included all the lands, bays, harbors and channels within those boundaries—their historic coastlines—and three miles or leagues of marginal sea.[43]  The Committee saw no reason to attempt to spell out its definition of inland waters, as including all historic bays and channels, when there was no reason to do so and when to do so might possibly have embarrassing repercussions on American foreign relations, where different definitions of

---

[43] The Committee Report also reprinted the favorable report of a Senate Committee during a previous session of a bill which the Committee said was "identical in substance with Senate Joint Resolution 13 as introduced."  Senate Report 49.  That earlier report, S. Rep. No. 1592, 80th Cong., 2d Sess., as quoted, criticised the *California* decision for creating great uncertainty as to what areas would be "inland waters" within the reasoning of the opinion.  Under the federal-external-sovereignty reasoning of the *California* case the Committee saw no clear answer to such questions as:

"At what precise point does a bay become a part of the open sea?  Are waters landward of offshore islands inland waters?  Are uplands formed by nature subsequent to the date of fixing the low-water mark subject to 'the paramount power' of the United States as defined by the Court's opinion?"  Senate Report 61.

The Committee sought in the legislation to avoid these "extreme complexities," *ibid.*, by enacting "a law consonant with what the States and the Supreme Court believed for more than a century was the law," *ibid.*, and restoring to the States all their historic property rights both to inland waters and to the marginal sea.  The Report said:

"Unless S. 1988 as reported, is enacted, confusion will exist as to the ownership and taxability of, and powers over, bays and the 3-mile belt . . . .  We consider it against the public interest for the Federal Government to commence a series of vexatious lawsuits against the sovereign States to recover submerged lands within the boundaries of the States, traditionally looked upon as the property of the States under a century of pronouncements by the Supreme Court reflecting its belief that the States owned these lands."  *Id.*, at 62.

inland waters prevailed. Lest anyone misconstrue the change, the Committee said with reference to it:

"The elimination of the language, in the committee's opinion, is consistent with the philosophy of the Holland bill to place the States in the position in which both they and the Federal Government thought they were for more than a century and a half, and not to create any situations with respect thereto." [44]

The Court reads this change in words as showing "a legislative intent to leave the definition of inland waters to the courts without restriction." *Ante,* p. 154. The Court agrees that before this change was made, the bill gave the States all the submerged lands out to their historic boundaries. The Court admits that the 1947 *California* decision rejected the States' claims to their historic boundaries and, according to the Court, set up a test of international law and foreign-policy standards for measuring inland waters. But the Court concludes that when the Committee said that it was leaving the States with the rights to inland waters which they had before the *California* decision, it really meant to establish the international law standard, including the Boggs formula (except insofar as that formula has since been abandoned by treaty) which many Senators had so strenuously opposed and which in their Committee Report they specifically stated they did not mean to adopt. I think that a fair reading of the discussion of this change shows that the Committee members intended that all the States should have their boundaries, including a belt of marginal sea and all the lands and waters from which they had historically measured their claims to the marginal sea, which they thought would have been recognized as such by the courts up to the time of the *California* decision, and that the test of inland waters and coastlines was therefore an historical one. The Committee regarded

---

[44] Senate Report 18.

the *California* decision as a complete aberration, and assumed that before it all courts would have judged inland waters by historical tests, as in fact several California and federal decisions show they had.[45]  I cannot understand how the Court reasons that when the Committee said that it left the States as it thought they were *before* the *California* decision, it really meant to put them in the position the Court says they were in *after* that case, insofar as inland waters and their coastlines are concerned. I think that the amendment did just what the Committee said it did: it freed Congress from the need of "having to determine matters that are highly technical," [46] and left it for the States to prove if they could the facts to support their historic claims that particular bodies were inland waters behind the coastline.  Senator Kuchel of California, fully familiar with the problems of California, and on the alert to protect that State's interest in the bays and channels within its historic boundaries, interpreted the bill properly, I think, when he said:

> "In recognizing State ownership of lands beneath navigable waters within historic State boundaries, this joint resolution wisely makes no attempt to define exactly what those boundaries are.  In substance, the resolution provides that each of the States has ownership of all lands beneath navigable waters extending, in the case of littoral States, 3 geographical miles seaward from its coastline, or *to its historic boundary*." [47]

Thus up to this point in the legislative history I think it can be said that (1) the Holland bill as originally

---

[45] See *infra*, p. 212. "[T]he sponsors understood this Court to have established, prior to the *California* decision, a rule of state ownership itself defined in terms of state territorial boundaries . . . ." *United States* v. *Louisiana*, 363 U. S. 1, 19–20.

[46] Senate Hearings 1383 (Senator Cordon).

[47] 99 Cong. Rec. 2984.  (Emphasis supplied.)

drafted unquestionably gave the States title to all submerged lands out as far as their historic boundaries; and (2) the elimination of the legislative definition of inland waters did not alter the original intent of the bill in the slightest degree, but rather left it up to the States to prove that particular bays, channels or harbors were inside their coastlines as part of their "historic boundaries," according to "the position in which both they and the Federal Government thought they were for more than a century and a half." [48]

## B. THE THREE-MILE OR THREE-LEAGUE LIMITATION.

The Court calls attention to one other change in the bill before its enactment, and on the significance attributed to this one small change depends the validity of the Court's entire opinion. The Court says that this change was fundamental, of vital importance. It says that to the extent of this change, "the philosophy [of the Holland Bill] was modified." *Ante*, p. 154. I find this altogether surprising, since when the change was introduced—by Senator Holland himself—and adopted almost immediately without any opposition being voiced, he said it was "just a minor change of verbiage," [49] one of several "minor changes for the purpose of clarification." [50] If the change was to have the dramatic effect which the Court attributes to it, Senator Holland certainly did not recognize it, for he said that it did "not depart in the slightest from the intention of the sponsors of the joint resolution." [51] This amendment along with others was adopted after discussion occupying less than two pages in the Congressional Record, without a roll-call vote, without even one single objection from the Senate floor. Fundamental

---

[48] Senate Report 18, *supra,* n. 44.

[49] 99 Cong. Rec. 4115.

[50] *Id.,* at 4114.

[51] *Ibid.*

changes in the basic purpose of bills are never adopted in that way. Senator Holland's explanation that this was "just a minor change of verbiage" should be accepted by this Court, as I have no doubt it was accepted by the Senate.

This change which its sponsor thought was "minor" and which the Court thinks is fundamental, and on which the Court's whole argument depends, merely modified the definition of "boundaries" in § 2 of the Act by adding:

> "but in no event shall the term 'boundaries' or the term 'lands beneath navigable waters' be interpreted as extending from the coast line more than three geographical miles into the Atlantic Ocean or the Pacific Ocean, or more than three marine leagues into the Gulf of Mexico." [52]

The Court says that this language implicitly did away with the original and continued intention of the proponents of the bill to "restore" to the States the ownership of all submerged lands lying under all waters within their historic boundaries, wherever those boundaries lay, and instead established a rule that historic boundaries would not be honored if they extended more than three miles from the coastline, i. e., from the seaward edge of the inland waters as the Court today defines inland waters. The Court then reads the legislative history as destroying the historic definition of inland waters—which is, of course, all waters within a State's boundaries exclusive of claims to marginal sea—and substituting a very restrictive one based on this Court's decision in the *California* case, a reading which I have indicated above is, I think, flatly contrary to what the legislative history shows. The Court thus holds that by making two minor changes in the bill, which changes they said over and over again were of no substantive significance, the Senators supporting it silently repudiated in large measure their own intention,

---

[52] § 2 (b), 67 Stat. 29, 43 U. S. C. § 1301 (b) (1958 ed.).

which they had proclaimed to the public and the Senate from the beginning and continued to proclaim to the end, of restoring to the States their historic constitutional boundaries.

This three-mile or three-league limitation amendment was added for a very simple reason, which is plain in the Congressional Record and which shows that the sponsors of the bill were reaffirming rather than abandoning their basic original purpose in offering this and similar bills: they wished to restore to the States the submerged lands out to their historic boundaries, including three miles or leagues of marginal sea, but no farther. As reported from Committee, the bill gave the States submerged lands out to their boundaries at the time they entered the Union "or as heretofore or hereafter approved by Congress" without any limitation. It was feared by some that one or more of the States, none of which had ever claimed more than three miles (or leagues) of the marginal sea, might suddenly assert claims that their boundaries extended out hundreds of miles to the very limits of the Continental Shelf.[53] If allowed to do this, the fear was expressed, such States would be taking title to mineral wealth far beyond the historic boundaries to which the sponsors of the bill wished to confine them. The sponsors stated that their purpose was merely to "restore" to the States what they had thought they had had as boundaries—the outer part of the Continental Shelf was to belong to the Federal Government.[54] In order to prevent any States from trying to use the word "boundaries" in the Act to push their boundaries out beyond their his-

---

[53] See, e. g., 99 Cong. Rec. 2917, 2975–2977, 3040, 3273, 3336–3337, 3381, 3549, 3552–3553, 3655, 3885–3886, 4085.

[54] Compare the Outer Continental Shelf Lands Act, 67 Stat. 462, 43 U. S. C. §§ 1331–1343 (1958 ed.), passed the same year, claiming for the United States "jurisdiction, control, and power of disposition" of all submerged lands seaward of the area granted the States in the Submerged Lands Act.

toric three-mile or three-league claims to the marginal sea, Senator Holland himself introduced this amendment. It deleted the words "or hereafter," thus limiting the States to any boundaries which they had previously claimed, in spite of any claims they might make in the future; and it also set forth as a limitation the Senators' understanding of the maximum extent of the marginal sea historically claimed by any State from or as a part of its historic boundaries: three geographical miles in the Atlantic and Pacific Oceans, and three leagues in the Gulf of Mexico. As Senator Holland explained, a limitation to existing boundaries had been the intention of the bill's sponsors all along, and it had been and was the understanding of the sponsors that no States claimed that their historic boundaries extended more than three miles from their coastlines in the Atlantic or Pacific Oceans. He said the three-mile limitation was "just a minor change of verbiage" [55] made in order "to make very clear that Congress at this time is seeking to do only those things which the authors and supporters of the joint resolution have so very fully, and rather repeatedly, stated for the RECORD heretofore during the course of the debate." [56] He reiterated that

> "The amendment will simply indicate that this Senate, in the passage of the joint resolution, is certainly not inviting *additional claims,* and it knows of no *additional claims.*" [57]

Senator Holland, as the record shows, and many other Senators were well aware of California's existing claim, which is now before us, and could not have considered it to be "additional." [58]

Time and time again the proponents of the bill stated before the amendment was passed that no State claimed

---

[55] 99 Cong. Rec. 4115.
[56] *Ibid.*
[57] *Ibid.* (Emphasis supplied.)
[58] See, *e. g.,* Senate Hearings 48–49.

more than three miles or leagues of marginal sea as part of its historic boundaries, and no State would be given rights by the bill beyond those original claims. Said Senator Holland, "I emphasize the fact that this joint resolution does not extend the boundary of any State beyond the 3-mile limit." [59]   Said Senator Daniel, again before the amendment:

> ". . . those of us who are coauthors of this measure have always understood that it was not necessary to write into the pending legislation a specific provision that it shall not apply to lands beyond 3 miles, or 3 leagues, because all the States are claiming is 3 miles, except in the Gulf of Mexico where historic boundaries are 3 leagues from shore." [60]

He added:

> "I believe that the exchange here within the past few minutes should make it very clear that the authors of this measure are not trying to give to the States, or to restore to the States, any lands outside their historic boundaries." [61]

The claims of the States to a belt of marginal waters of course did not determine the location of the coastline from which such a belt would be measured.   California's historic coastline, it says, was the outer limit of the bays and islands.   In limiting the States to their historic claims of three miles or three leagues from their "coast lines," wherever those "coast lines" might be, Congress unquestionably, I think, was leaving totally undisturbed the validity of their historic claims to the boundaries from which those belts would be measured.

---

[59] 99  Cong. Rec. 2746.

[60] *Id.*, 3039.

[61] *Id.*, 3051.

The Court's opinion lays great stress on an opinion expressed by Senator Holland that California's claim that its historic boundary of inland waters and marginal sea extended out to and three miles beyond its offshore islands was not persuasive. The Court leaves the impression that Senator Holland made a ruling that California's claim would not be covered by the Act. In fact he did nothing of the kind, but merely expressed the opinion to opponents of the bill who said that restoring the States to their historic boundaries would give them too large an area of submerged lands and who cited California's claim to the channel as an example, that he thought California would have a difficult time in proving that its historic boundary extended so far. The context of Senator Holland's remarks is important to set out in full, since when read in context his opinion, which he later repeated on several occasions, serves to emphasize that he intended that each State be allowed to prove where its historic boundaries lay, which is all that California is asking that it be allowed to do here, and which is what the Court now denies it.

The exchange began when Senator Long of Louisiana asked Senator Holland about how far seaward Louisiana's boundary would extend under the bill. Senator Long said:

> "Now, if I understand correctly, the Senator is not proposing that the actual determination of exactly what was the historic boundary at the time Louisiana came into the Union be decided by the Congress, but rather that the question of the *historic boundary of the State* might be *one still subject to actual judicial determination.*
>
> "Senator HOLLAND. Of course, the Senator is right.

.        .        .        .        .

"Senator HOLLAND. We cannot draft general legislation that will still every possible legal question." [62]

Senator Anderson of New Mexico then asked Senator Holland whether the bill validated the claim of California that its historic boundary extended to the offshore islands with a three-mile belt of marginal sea beyond them. To this Senator Holland replied:

"The Senator from Florida can only give his opinion, and in his opinion it would not, because of the great depths of the water that exist between the coastline of California and the extrusions from the sea bottom which appear out there, and some of which are above the level of the water. *Again, though, the Senator from Florida states that that would be a matter, naturally, on which the courts would be asked to rule.* We are not going to find any formula that displaces the function of the courts to go into cases and find which cases come within the general doctrine announced by legislation and which fall without that legislation." [63]

In other words, the bill did not settle definitively the question of fact as to whether California's historic boundary was to be measured from the outer rim of the islands. That was a question on which courts would have to hear evidence and then decide according to "the general doctrine announced by [this] legislation"—the doctrine, as Senator Holland and others repeated so many times, that the States were to be restored to their "historic boundaries." And as he said in summary, there was nothing in his bill which would diminish California's claim to the waters and submerged lands around its offshore islands. [64]

---

[62] Senate Hearings 48. (Emphasis supplied.)

[63] *Id.,* 48–49. (Emphasis supplied.)

[64] *Id.,* 50–51.

In later referring to the adoption of Senator Holland's amendment to the bill, Senator Daniel of Texas said, "the intention was to write specifically into the joint resolution what the authors have said all along would be its effect—that it covered only land within the historic boundaries." [65]

As a further indication that the three-miles-from-coast-line amendment was not intended to affect States' claims to their historic boundaries, the record shows that opponents of the bill subsequently tried to amend it to restrict the line from which the three-mile limits would be measured, and failed. Senator Douglas of Illinois, a leader of the opposition, proposed an amendment which would have changed the definition of "coast line" in the bill so that the three miles would be measured only from the main continent, and separately around any islands, thus cutting off California's claim to the submerged lands between the islands and the mainland, which is largely the issue before us now. Senator Douglas indicated specifically that his proposed amendment was intended to destroy California's claim to those submerged lands, and that he had warned Senator Kuchel of California of his intention to introduce it.[66] Senator Long of Louisiana objected that "the Senator from Illinois is submitting his own definition of inland waters." [67] Senator Douglas' amendment was defeated,[68] and California's historic

---

[65] 99 Cong. Rec. 4175. See also id., 4477, 4478 (remarks of Senator Daniel).

[66] Id., 4240. Senator Douglas said that his amendment was aimed at "preventing coastal States from pushing their coastal boundaries out to a line along the outer shores of remote islands and claiming everything in between." Id., 4242.

[67] Id., 4241.

[68] Id., 4242. An earlier attempt by Senator Douglas and others to strike from the bill reference to the historic boundaries of the States when they entered the Union, and substitute a limitation based on the marginal waters claimed by the Federal Government

claims, for whatever they might prove to be worth, were left, as Senator Holland had stated, undiminished.

I think that this review of the relevant hearings and debates in the Senate makes clear three things: (1) As originally proposed, the bill was intended to "restore" to the States title to submerged lands within their historic boundaries, whatever those might prove to be. (2) The removal of the explicit definition of inland waters, far from being, as the Court views it, fundamental, was not a "change of substance" [69] and was "not done in any manner to prejudice the rights of the States"; [70] it was intended merely to avoid possible embarrassment in the field of international relations from a bill which had noth-

---

under international law, had also failed. See 99 Cong. Rec. 3957–3960, 4114. Senator Cordon had objected that the "net result" of the amendment "would be that an arbitrary 3-mile limit would be established, rather than to follow the philosophy of the joint resolution itself. The resolution provides that the limit be the statutory boundary with which a State entered the Union, or as such boundary may have been subsequently approved by an act of the Congress." 99 Cong. Rec. 4106.

Several similar attempts by opponents of the bill to amend it to restrict the States to a belt within three miles of their mainland shores also failed. Senator Monroney introduced an amendment to limit the area restored to the States to three miles seaward of the low-tide mark on the shore. 99 Cong. Rec. 4157. Senator Long, a supporter of the bill (which already contained the two changes which the Court says were fundamental) protested:

"In view of the fact that the Congress has already indicated its intention of vesting in the States proprietary rights within their historic boundaries, does the Senator have any objection to the Court's deciding what the historic boundaries are?" 99 Cong. Rec. 4160.

The proposed amendment was defeated. 99 Cong. Rec. 4203. A similar measure introduced by Senator Magnuson, which he emphasized would have limited the States to the amount of marginal sea which the United States claimed in international relations, was likewise defeated. 99 Cong. Rec. 4473–4478.

[69] Senate Report 2.
[70] Senate Hearings 1384 (Senator Daniel).

ing to do with international relations or international law, being merely a "transfer of title." [71] (3) The addition of the limitation of boundaries to three miles beyond the coastline, far from being, as the Court views it, fundamental, was "just a minor change of verbiage" [72] intended to make clear what the bill's sponsors had intended all along: that the bill was not designed to allow States in the future to push their boundaries out to the limits of the Continental Shelf, but rather to limit them to everything within their historic boundaries, including historic coastlines and historic three-mile or three-league claims to the marginal sea beyond.

Near the conclusion of the debates on the bill Senator Holland in explaining its purpose used these words, which I do not think show any fundamental or even perceptible changes or modifications of philosophy from those he had used in his first speech on the bill:

"The truth is that Senate Joint Resolution 13 simply restores or gives back to the States the submerged lands within their historic boundaries which they have possessed, used and developed in good faith for over 100 years. . . .

.        .        .        .        .

". . . It would write the law for the future as it was believed to exist in the past by restoring to the States all lands beneath navigable waters within their historic boundaries." [73]

## C. The House Legislative History.

The hearings and debates in the House were less extensive than those in the Senate, but the intention of the legislators there to restore to the States all submerged

[71] *Id.*, 1304 (Senator Cordon).
[72] 99 Cong. Rec. 4115 (Senator Holland).
[73] *Id.*, 4361.

lands within their historic boundaries was no less explicit. Forty different bills, of which one [74] was identical with the Senate Joint Resolution passed by both Houses the year before and with the Senate bill introduced by Senator Holland, were considered by the House Subcommittee and Committee. The Committee chose the latter bill and with minor perfecting amendments reported it favorably to the House.[75] Typical of the testimony at the hearings was the statement by Attorney General Brownell that:

> "The States want, and we believe they are entitled to, all the development rights, you might say, in these submerged lands within their historic boundaries." [76]

The House Committee Report on the bill said:

> "Title II confirms and establishes the rights and claims of the 48 States, asserted and exercised by them throughout our country's history, to the lands beneath navigable waters within State boundaries and the resources within such lands and waters." [77]

In explaining the bill to the members of the House, Congressman Willis of Louisiana, a member of the Committee and a supporter of the bill, said:

> "First, it restores to the States complete title to the submerged lands up to the limit of their historic boundaries." [78]

---

[74] H. R. 2948, 83d Cong., 1st Sess. See H. R. Rep. No. 215, 83d Cong., 1st Sess. (hereafter cited as House Report), 3.

[75] H. R. 4198, 83d Cong., 1st Sess.

[76] Hearings before Subcommittee No. 1, House Committee on the Judiciary, on H. R. 2948 and Similar Bills, 83d Cong., 1st Sess., 219–220.

[77] House Report 14.

[78] 99 Cong. Rec. 2504.

And on the floor Congressman Wilson of Texas, also a Committee member and supporter of the bill, explained its purpose in the following exchange:

> "Mr. WILSON of Texas. . . . Bear in mind that this is title II, the title that returns or restores this seaward boundary within the historical boundaries of the States to the States . . . .
>
> .        .        .        .        .
>
> "Mr. HALLECK. If we stick to the provisions of the bill, then we are just being consistent with respect to the title to the land within the historic boundaries?
>
> "Mr. WILSON of Texas. That is true." [79]

The House bill, passed with this intention, was then sent to the Senate, which at that time was considering Senator Holland's bill, a virtually identical measure. After the Senate passed the Holland bill, with the two changes which the Court deems fundamental, Congressman Reed, Chairman of the House Judiciary Committee, which had reported the House bill, asked the members of the House to accede to their bill as amended by the Senate. He prefaced his remarks by saying:

> "Mr. Speaker, I trust that 3 minutes will be sufficient for me to say all that I deem necessary about this resolution." [80]

He then proceeded in these words to tell the members of the House what had happened to their bill as adopted by the Senate:

> "Titles I and II of the original bill, H. R. 4198, are now before us. *There have been no substantial changes made by the Senate in these titles.* They are practically the same as when passed by the House

---

[79] *Id.*, 2567.
[80] *Id.*, 4897.

except in a few instances where a few words and phrases here and there have been changed or deleted for clarification.

"About the only thing that is substantially new in this bill is a reassertion by the Senate in section 9 which confirms the rights of the United States to the jurisdiction and control of the lands under the Continental Shelf outside of State boundaries." [81]

Relying on these assurances by Chairman Reed that there had been "no substantial changes" made in the bill by the Senate, the House without further discussion of the portions of the bill here involved proceeded to adopt the Senate version, which after being signed by the President became the Submerged Lands Act of 1953.

This, then, is the legislative history of the Submerged Lands Act, both in the Senate and in the House, which, according to the Court, shows that the sponsors and supporters of the Act completely altered their intention of restoring to the States the submerged lands within their historic boundaries, and instead left the States with what the Court allows them today. I think that the statements and actions of the supporters of the bill show on the contrary that the intention of restoring all submerged lands under all waters within historic state boundaries was plainly and explicitly stated and understood by all from the beginning, and, despite attacks from opponents of the bill, never varied. Time and time again the Senators and Congressmen repeated that the bill had not been changed in any way to diminish the rights granted to the States in the bill as originally introduced—rights which, as the Court does not dispute, included the right to all submerged lands under all waters within historic state boundaries. I would follow the understanding of the authors and supporters of the bill, and I would take them at their word.

---

[81] *Ibid.* (Emphasis supplied.)

## IV.

In light of this legislative history, of which I have set forth only a small part, I think that under the Submerged Lands Act California is entitled to all the submerged lands within its historic boundaries, and that it should be given an opportunity to try to prove in hearings before a Master where those historic boundaries were. The Court says that Congress left it up to this Court to expound the legal principles which shall determine California's claims, without any reference to the Submerged Lands Act's stated purpose to restore the mineral rights of the States in submerged lands within their historic boundaries. I think the Court is completely misreading the intentions of the authors and supporters of the Act. If there is anything clear in the legislative history, it is that Congress was not satisfied with the way in which this Court had decided the *California* case and did not approve of the considerations of external sovereignty used there in determining a domestic dispute over title. It seems to me the height of irony to hold that an Act passed expressly to escape the effect of this Court's opinion in this field is now construed as leaving us free to announce principles directly antithetic to the basic purpose of Congress of deciding that question for itself once and for all. True, the Congress left to the courts the exercise of their historic function to decide the factual question of where a State's historic boundaries, based on those approved when it was admitted to the Union, lie. But I think the Court errs in arguing repeatedly that by leaving it to the courts to decide the issues of fact in particular cases, Congress meant to leave it to this Court to determine the legal principles governing California's claim, and in particular to do so by adopting a formula of its own devising based on one used by the State Department in its handling of foreign affairs.

California has never been given an opportunity to appear at a hearing to determine where its boundaries were when it came into the Union. The 13-year-old report of the Master quite naturally considered this issue irrelevant since the Submerged Lands Act had not been passed at the time that report was made. Certainly it cannot be asserted that California's claim that its 1849 boundaries included these areas is frivolous. By the terms of its constitution approved by Congress when the State was admitted to the Union in 1850, and over the years, California appears to have claimed that its boundaries extended beyond its outlying islands and has claimed as inland waters within those boundaries all the bays, harbors and channels in question in this lawsuit. A statement in the original California Constitution,[82] several official maps, including the one used at the Cali-

---

[82] Article XII of the California Constitution of 1849, approved when the State was admitted to the Union (Act of Sept. 9, 1850, 9 Stat. 452), provides:

"The boundary of the State of California shall be as follows:

"Commencing at the point of intersection of forty-second degree of north latitude with the one hundred and twentieth degree of longitude west from Greenwich, and running south on the line of said one hundred and twentieth degree of west longitude until it intersects the thirty-ninth degree of north latitude; thence running in a straight line in a southeasterly direction to the river Colorado, at a point where it intersects the thirty-fifth degree of north latitude; thence down the middle of the channel of said river to the boundary-line between the United States and Mexico, as established by the treaty of May 30, 1848; thence running west and along said boundary-line to the Pacific Ocean, and extending therein three English miles; thence running in a northwesterly direction, and following the direction of the Pacific coast, to the forty-second degree of north latitude; thence on the line of said forty-second degree of north latitude to the place of beginning. *Also all the islands, harbors, and bays along and adjacent to the Pacific coast.*" (Emphasis supplied.) H. R. Doc. No. 357, 59th Cong., 2d Sess., 405.

California contends that the inclusion of the islands off the shore also includes within the boundaries all waters between the islands and the mainland.

fornia constitutional convention in 1849,[83] and other evidence tend to support California's contention that it historically owned these bays and the channel between the islands and the mainland. Both state and federal court decisions have held as a matter of fact and law that some of the very bays in question here, which the Government argues are not inland waters in the international sense, were within the boundaries of the State and subject to its jurisdiction. *Ocean Industries, Inc.* v. *Greene,* 15 F. 2d 862 (D. C. N. D. Cal.) (Monterey Bay); *United States* v. *Carrillo,* 13 F. Supp. 121 (D. C. S. D. Cal.) (San Pedro Bay); *People* v. *Stralla,* 14 Cal. 2d 617, 96 P. 2d 941 (Santa Monica Bay); *Ocean Industries, Inc.* v. *Superior Court,* 200 Cal. 235, 252 P. 722 (Monterey Bay). Indeed, in one of these cases, *People* v. *Stralla, supra,* the United States Attorney with the authorization of the Attorney General of the United States appeared as *amicus curiae* agreeing with the State's attorney that all of the bay in question there as here was within California's boundaries and subject to its exclusive territorial jurisdiction.[84]

There may be evidence which tends to disprove the historic validity of California's claims. But what California has asked here is an opportunity to prove where its boundaries historically were, to use the test of ownership fixed by Congress in the Submerged Lands Act rather than the foreign-relations tests set up by the Special Master 13 years ago and approved by this Court today for the first time. I think that the legislative history of the Submerged Lands Act shows without question that the definitions in it were to be read as preserving to the maritime States their claims to submerged lands and waters within

---

[83] Reproduced in part in Appendix D, *infra.*

[84] The brief of the United States Attorney, filed *sub nom. People* v. *Adams,* is reprinted as Appendix 3 to the Brief for the State of California in the Proceedings Before the Special Master, pp. 6–22.

their historic boundaries, and that those who offered and supported the bill regarded California's claim to these bays, harbors and the channel out to its offshore islands as something the State would be allowed to try to prove. In litigation to determine the extent of the outer limits of the States' historic boundaries in the marginal sea in the Gulf of Mexico, Texas and Florida were allowed to prove their historic boundaries and won in *United States* v. *Louisiana,* 363 U. S. 1, and *United States* v. *Florida,* 363 U. S. 121, respectively. Louisiana, Mississippi, and Alabama based their claims in the Gulf of Mexico on historic boundaries and this Court decided against them on the facts in *United States* v. *Louisiana, supra.* All five of those States were given an opportunity to try to prove their historic boundaries, in order to determine the extent of the submerged lands to which they were entitled by the Submerged Lands Act. California has had no such opportunity. California set up as an affirmative defense in 1946 that its boundaries extended to the point it presently claims. We did not pass on this contention then, for we held that regardless of where the historic boundaries were, the United States had paramount rights in all its marginal sea. The Court today still leaves the question of the State's historic boundaries undecided, except insofar as relevant to international claims of the United States, and instead decides this case on the basis of standards of international law derived from the reasoning of the 1947 *California* case. Congress did not, I think, mean to readopt the standards of the *California* case, which the authors of the Submerged Lands Act so violently criticized, and to cut California off without any chance at all to establish ownership of these bays and channels by proving that they were within the State's historic boundaries. In order to carry out what I believe to be the congressional command in the Submerged Lands Act, I would refer the case to a Special Master to give California that chance.

CRESCENT CITY BAY

- Areas conceded to California by the United States in this case
- Additional areas claimed by California in this case
- Approximate additional areas conceded by the United States
- Illustrative result of the straight baseline principle claimed by California

SAN FRANCISCO BAY

FARALLON ISLANDS

MONTEREY BAY

SAN LUIS OBISPO BAY

POINT CONCEPTION

POINT HUENEME

SANTA MONICA BAY

SAN PEDRO BAY

NEWPORT BAY

Geographical Miles

20  0  20  40  60  80  100

POINT LOMA

# CALIFORNIA

Pt.
Conception

SANTA BARBARA

VENTURA

*SANTA   BARBARA   CHANNEL*

PORT
HUENEME

Richardson Rk.

MALIBU

LOS ANGELES

SANTA
MONICA

SAN MIGUEL I.

ANACAPA I.

— 34°

Bee Rk.

Gull I.

SANTA CRUZ I.

*SANTA MONICA
BAY*

SANTA
ROSA I.

LONG BEACH

SAN PEDRO

*SAN PEDRO
BAY*

HUNTINGTON BEACH

*SAN PEDRO CHANNEL*

N

SANTA
BARBARA I.

SANTA
CATALINA I.

Begg Rk.

SAN NICOLAS I.

*GULF     OF*

OCEANSIDE

*SANTA     CATALINA*

Castle Rk.

— 33°

SAN
CLEMENTE I.

Pyramid Hd.

SAN
DIEGO

Pt. Loma

## OVER-ALL UNIT AREA OF INLAND WATERS

U.S.
MEXICO

GEOGRAPHICAL   MILES

0        10        20        30        40

120°

119°

118°

773-303 O - 65 (Face back of p. 213, blank) No. 3

GREAT BA

SIERRA NEVADA

Humboldt River

PAH-UTAH

UPPER

Inexplo

GENIGUEIH

Explanations

MAP OF
OREGON AND UPPER CALIFORNIA
From the Surveys of
JOHN CHARLES FREMONT
and other Authorities.

DRAWN BY CHARLES PREUSS
Under the Order of the
SENATE OF THE UNITED STATES
Washington City 1848.

Scale 1:3,000,000

Lith. by E. Weber & Co. Balto.

ARCHIVUM PROVINCIAE
OLD MISSION
SANTA BARBARA, CALIF.

